(Slip Opinion)     OCTOBER TERM, 2005                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## RAPANOS ET UX., ET AL. *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 04–1034.   Argued February 21, 2006—Decided June 19, 2006*

As relevant here, the Clean Water Act (CWA or Act) makes it unlawful to discharge dredged or fill material into "navigable waters" without a permit, 33 U. S. C. §§1311(a), 1342(a), and defines "navigable waters" as "the waters of the United States, including the territorial seas," §1362(7).  The Army Corps of Engineers (Corps), which issues permits for the discharge of dredged or fill material into navigable waters, interprets "the waters of the United States" expansively to include not only traditional navigable waters, 33 CFR §328.3(a)(1), but also other defined waters, §328.3(a)(2), (3); "[t]ributaries" of such waters, §328.3(a)(5); and wetlands "adjacent" to such waters and tributaries, §328.3(a)(7).  "[A]djacent" wetlands include those "bordering, contiguous [to], or neighboring" waters of the United States even when they are "separated from [such] waters . . . by man-made dikes . . . and the like."  §328.3(c).

   These cases involve four Michigan wetlands lying near ditches or man-made drains that eventually empty into traditional navigable waters.  In No. 04–1034, the United States brought civil enforcement proceedings against the Rapanos petitioners, who had backfilled three of the areas without a permit.  The District Court found federal jurisdiction over the wetlands because they were adjacent to "waters of the United States" and held petitioners liable for CWA violations. Affirming, the Sixth Circuit found federal jurisdiction based on the sites' hydrologic connections to the nearby ditches or drains, or to more remote navigable waters.  In No. 04–1384, the Carabell petitioners were denied a permit to deposit fill in a wetland that was

———————

*Together with No. 04–1384, *Carabell et al.* v. *United States Army Corps of Engineers et al.,* also on certiorari to the same court.

separated from a drainage ditch by an impermeable berm. The Carabells sued, but the District Court found federal jurisdiction over the site. Affirming, the Sixth Circuit held that the wetland was adjacent to navigable waters.

*Held:* The judgments are vacated, and the cases are remanded.

No. 04–1034, 376 F. 3d 629, and No. 04–1384, 391 F. 3d 704, vacated and remanded.

JUSTICE SCALIA, joined by THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO, concluded:

1. The phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams," "oceans, rivers, [and] lakes," Webster's New International Dictionary 2882 (2d ed.), and does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of that phrase is thus not "based on a permissible construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843. Pp. 12–21.

(a) While the meaning of "navigable waters" in the CWA is broader than the traditional definition found in *The Daniel Ball,* 10 Wall. 557, see *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159, 167 *(SWANCC); United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121, 133, the CWA authorizes federal jurisdiction only over "waters." The use of the definite article "the" and the plural number "waters" show plainly that §1362(7) does not refer to water in general, but more narrowly to water "[a]s found in streams," "oceans, rivers, [and] lakes," Webster's New International Dictionary 2882 (2d ed.). Those terms all connote relatively permanent bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Pp. 12–15.

(b) The Act's use of the traditional phrase "navigable waters" further confirms that the CWA confers jurisdiction only over relatively permanent bodies of water. Traditionally, such "waters" included only discrete bodies of water, and the term still carries some of its original substance, *SWANCC, supra,* at 172. This Court's subsequent interpretation of "the waters of the United States" in the CWA likewise confirms this limitation. See, *e.g., Riverside Bayview, supra,* at 131. And the CWA itself categorizes the channels and conduits that typically carry intermittent flows of water separately from "navigable waters," including them in the definition of "'point sources,'" 33 U. S. C. §1362(14). Moreover, only the foregoing definition of "waters" is consistent with CWA's stated policy "to recognize, preserve,

and protect the primary responsibilities and rights of the States . . . to plan the development and use . . . of land and water resources . . . ." §1251(b). In addition, "the waters of the United States" hardly qualifies as the clear and manifest statement from Congress needed to authorize intrusion into such an area of traditional state authority as land-use regulation; and to authorize federal action that stretches the limits of Congress's commerce power. See *SWANCC, supra,* at 173. Pp. 15–21.

2. A wetland may not be considered "adjacent to" remote "waters of the United States" based on a mere hydrologic connection. *Riverside Bayview* rested on an inherent ambiguity in defining where the "water" ends and its abutting ("adjacent") wetlands begin, permitting the Corps to rely on ecological considerations only to resolve that ambiguity in favor of treating all abutting wetlands as waters. Isolated ponds are not "waters of the United States" in their own right, see *SWANCC, supra,* at 167, 171, and present no boundary-drawing problem justifying the invocation of such ecological factors. Thus, only those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between the two, are "adjacent" to such waters and covered by the Act. Establishing coverage of the Rapanos and Carabell sites requires finding that the adjacent channel contains a relatively permanent "wate[r] of the United States," and that each wetland has a continuous surface connection to that water, making it difficult to determine where the water ends and the wetland begins. Pp. 21–24.

3. Because the Sixth Circuit applied an incorrect standard to determine whether the wetlands at issue are covered "waters," and because of the paucity of the record, the cases are remanded for further proceedings. P. 39.

JUSTICE KENNEDY concluded that the Sixth Circuit correctly recognized that a water or wetland constitutes "navigable waters" under the Act if it possesses a "significant nexus" to waters that are navigable in fact or that could reasonably be so made, *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159, 167, 172 *(SWANCC),* but did not consider all the factors necessary to determine that the lands in question had, or did not have, the requisite nexus. *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121, and *SWANCC* establish the framework for the inquiry here. The nexus required must be assessed in terms of the Act's goals and purposes. Congress enacted the law to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U. S. C. §1251(a), and it pursued that objective by restricting dumping and filling in "waters of the United States," §§1311(a), 1362(12).

Syllabus

The rationale for the Act's wetlands regulation, as the Corps has recognized, is that wetlands can perform critical functions related to the integrity of other waters—such as pollutant trapping, flood control, and runoff storage. 33 C. F. R. §320.4(b)(2). Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters understood as navigable in the traditional sense. When, in contrast, their effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the term "navigable waters." Because the Corps' theory of jurisdiction in these cases—adjacency to tributaries, however remote and insubstantial—goes beyond the *Riverside Bayview* holding, its assertion of jurisdiction cannot rest on that case. The breadth of the Corps' existing standard for tributaries—which seems to leave room for regulating drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water-volumes toward it—precludes that standard's adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood. Absent more specific regulations, the Corps must establish a significant nexus on a case-by-case basis when seeking to regulate wetlands based on adjacency to nonnavigable tributaries, in order to avoid unreasonable applications of the Act. In the instant cases the record contains evidence pointing to a possible significant nexus, but neither the agency nor the reviewing courts considered the issue in these terms. Thus, the cases should be remanded for further proceedings. Pp. 1–30.

SCALIA, J., announced the judgment of the Court, and delivered an opinion, in which ROBERTS, C. J., and THOMAS and ALITO, JJ., joined. ROBERTS, C. J., filed a concurring opinion. KENNEDY, J., filed an opinion concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 04–1034 and 04–1384

JOHN A. RAPANOS, ET UX., ET AL., PETITIONERS
04–1034                         *v.*
UNITED STATES

JUNE CARABELL ET AL., PETITIONERS
04–1384                         *v.*
UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 19, 2006]

JUSTICE SCALIA announced the judgment of the Court, and delivered an opinion, in which THE CHIEF JUSTICE, JUSTICE THOMAS, and JUSTICE ALITO join.

In April 1989, petitioner John A. Rapanos backfilled wetlands on a parcel of land in Michigan that he owned and sought to develop. This parcel included 54 acres of land with sometimes-saturated soil conditions. The nearest body of navigable water was 11 to 20 miles away. 339 F. 3d 447, 449 (CA6 2003) *(Rapanos I)*. Regulators had informed Mr. Rapanos that his saturated fields were "waters of the United States," 33 U. S. C. §1362(7), that could not be filled without a permit. Twelve years of criminal and civil litigation ensued.

The burden of federal regulation on those who would deposit fill material in locations denominated "waters of the United States" is not trivial. In deciding whether to

grant or deny a permit, the U. S. Army Corps of Engineers (Corps) exercises the discretion of an enlightened despot, relying on such factors as "economics," "aesthetics," "recreation," and "in general, the needs and welfare of the people," 33 CFR §320.4(a) (2004).[1] The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915—not counting costs of mitigation or design changes. Sunding & Zilberman, The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 74–76 (2002). "[O]ver $1.7 billion is spent each year by the private and public sectors obtaining wetlands permits." *Id.*, at 81. These costs cannot be avoided, because the Clean Water Act "impose[s] criminal liability," as well as steep civil fines, "on a broad range of ordinary industrial and commercial activities." *Hanousek* v. *United States*, 528 U. S. 1102, 1103 (2000) (THOMAS, J., dissenting from denial of certiorari). In this litigation, for example, for backfilling his own wet fields, Mr. Rapanos faced 63 months in prison and hundreds of thousands of dollars in criminal and civil fines. See *United States* v. *Rapanos,* 235 F. 3d 256, 260 (CA6 2000).

The enforcement proceedings against Mr. Rapanos are a small part of the immense expansion of federal regulation of land use that has occurred under the Clean Water Act—

---

[1] In issuing permits, the Corps directs that "[a]ll factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people." §320.4(a).

without any change in the governing statute—during the past five Presidential administrations. In the last three decades, the Corps and the Environmental Protection Agency (EPA) have interpreted their jurisdiction over "the waters of the United States" to cover 270-to-300 million acres of swampy lands in the United States—including half of Alaska and an area the size of California in the lower 48 States. And that was just the beginning. The Corps has also asserted jurisdiction over virtually any parcel of land containing a channel or conduit—whether man-made or natural, broad or narrow, permanent or ephemeral—through which rainwater or drainage may occasionally or intermittently flow. On this view, the federally regulated "waters of the United States" include storm drains, roadside ditches, ripples of sand in the desert that may contain water once a year, and lands that are covered by floodwaters once every 100 years. Because they include the land containing storm sewers and desert washes, the statutory "waters of the United States" engulf entire cities and immense arid wastelands. In fact, the entire land area of the United States lies in some drainage basin, and an endless network of visible channels furrows the entire surface, containing water ephemerally wherever the rain falls. Any plot of land containing such a channel may potentially be regulated as a "water of the United States."

I

Congress passed the Clean Water Act (CWA or Act) in 1972. The Act's stated objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 86 Stat. 816, 33 U. S. C. §1251(a). The Act also states that "[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and

water resources, and to consult with the Administrator in the exercise of his authority under this chapter." §1251(b).

One of the statute's principal provisions is 33 U. S. C. §1311(a), which provides that "the discharge of any pollutant by any person shall be unlawful." "The discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," §1362(12), and "pollutant" is defined broadly to include not only traditional contaminants but also solids such as "dredged spoil, . . . rock, sand, [and] cellar dirt," §1362(6). And, most relevant here, the CWA defines "navigable waters" as "the waters of the United States, including the territorial seas." §1362(7).

The Act also provides certain exceptions to its prohibition of "the discharge of any pollutant by any person." §1311(a). Section 1342(a) authorizes the Administrator of the EPA to "issue a permit for the discharge of any pollutant, . . . notwithstanding section 1311(a) of this title." Section 1344 authorizes the Secretary of the Army, acting through the Corps, to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." §1344(a), (d). It is the discharge of "dredged or fill material"—which, unlike traditional water pollutants, are solids that do not readily wash downstream—that we consider today.

For a century prior to the CWA, we had interpreted the phrase "navigable waters of the United States" in the Act's predecessor statutes to refer to interstate waters that are "navigable in fact" or readily susceptible of being rendered so. *The Daniel Ball*, 10 Wall. 557, 563 (1871); see also *United States* v. *Appalachian Elec. Power Co.*, 311 U. S. 377, 406 (1940). After passage of the CWA, the Corps initially adopted this traditional judicial definition for the Act's term "navigable waters." See 39 Fed. Reg. 12119, codified at 33 CFR §209.120(d)(1) (1974); see also *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of*

*Engineers*, 531 U. S. 159, 168 (2001) *(SWANCC)*. After a District Court enjoined these regulations as too narrow, *Natural Resources Defense Council, Inc.* v. *Callaway*, 392 F. Supp. 685, 686 (DC 1975), the Corps adopted a far broader definition. See 40 Fed. Reg. 31324–31325 (1975); 42 Fed. Reg. 37144 (1977). The Corps' new regulations deliberately sought to extend the definition of "the waters of the United States" to the outer limits of Congress's commerce power. See *id.,* at 37144, n. 2.

The Corps' current regulations interpret "the waters of the United States" to include, in addition to traditional interstate navigable waters, 33 CFR §328.3(a)(1) (2004), "[a]ll interstate waters including interstate wetlands," §328.3(a)(2); "[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce," §328.3(a)(3); "[t]ributaries of [such] waters," §328.3(a)(5); and "[w]etlands adjacent to [such] waters [and tributaries] (other than waters that are themselves wetlands)," §328.3(a)(7). The regulation defines "adjacent" wetlands as those "bordering, contiguous [to], or neighboring" waters of the United States. §328.3(c). It specifically provides that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" *Ibid.*

We first addressed the proper interpretation of 33 U. S. C. §1362(7)'s phrase "the waters of the United States" in *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985). That case concerned a wetland that "was adjacent to a body of navigable water," because "the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent's property to . . . a navigable waterway." *Id.*, at 131;

see also 33 CFR §328.3(b) (2004). Noting that "the transition from water to solid ground is not necessarily or even typically an abrupt one," and that "the Corps must necessarily choose some point at which water ends and land begins," 474 U. S., at 132, we upheld the Corps' interpretation of "the waters of the United States" to include wetlands that "actually abut[ted] on" traditional navigable waters. *Id.,* at 135.

Following our decision in *Riverside Bayview*, the Corps adopted increasingly broad interpretations of its own regulations under the Act. For example, in 1986, to "clarify" the reach of its jurisdiction, the Corps announced the so-called "Migratory Bird Rule," which purported to extend its jurisdiction to any intrastate waters "[w]hich are or would be used as habitat" by migratory birds. 51 Fed. Reg. 41217; see also *SWANCC, supra,* at 163–164. In addition, the Corps interpreted its own regulations to include "ephemeral streams" and "drainage ditches" as "tributaries" that are part of the "waters of the United States," see 33 CFR §328.3(a)(5), provided that they have a perceptible "ordinary high water mark" as defined in §328.3(e). 65 Fed. Reg. 12823 (2000). This interpretation extended "the waters of the United States" to virtually any land feature over which rainwater or drainage passes and leaves a visible mark—even if only "the presence of litter and debris." 33 CFR §328.3(e). See also U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Government Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO–04–297, pp. 20–22 (Feb. 2004) (hereinafter GAO Report), http://www.gao.gov/new.items/d04297.pdf (all Internet materials as visited June 9, 2006, and available in Clerk of Court's case file). Prior to our decision in *SWANCC*, lower courts upheld the application of this

expansive definition of "tributaries" to such entities as storm sewers that contained flow to covered waters during heavy rainfall, *United States* v. *Eidson*, 108 F. 3d 1336, 1340–1342 (CA11 1997), and dry arroyos connected to remote waters through the flow of groundwater over "centuries," *Quivira Mining Co.* v. *EPA*, 765 F. 2d 126, 129 (CA10 1985).

In *SWANCC*, we considered the application of the Corps' "Migratory Bird Rule" to "an abandoned sand and gravel pit in northern Illinois." 531 U. S., at 162. Observing that "[i]t was the *significant nexus* between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview*," *id.,* at 167 (emphasis added), we held that *Riverside Bayview* did not establish "that the jurisdiction of the Corps extends to ponds that are not adjacent to open water." 531 U. S., at 168 (emphasis deleted). On the contrary, we held that "nonnavigable, isolated, intrastate waters," *id.*, at 171—which, unlike the wetlands at issue in *Riverside Bayview*, did not "actually abu[t] on a navigable waterway," 531 U. S., at 167—were not included as "waters of the United States."

Following our decision in *SWANCC*, the Corps did not significantly revise its theory of federal jurisdiction under §1344(a). The Corps provided notice of a proposed rule-making in light of *SWANCC*, 68 Fed. Reg. 1991 (2003), but ultimately did not amend its published regulations. Because *SWANCC* did not directly address tributaries, the Corps notified its field staff that they "should continue to assert jurisdiction over traditional navigable waters . . . and, generally speaking, their tributary systems (and adjacent wetlands)." 68 Fed. Reg. 1998. In addition, because *SWANCC* did not overrule *Riverside Bayview*, the Corps continues to assert jurisdiction over waters "'neighboring'" traditional navigable waters and their tributaries. 68 Fed. Reg. 1997 (quoting 33 CFR §328.3(c) (2003)).

Even after *SWANCC*, the lower courts have continued to uphold the Corps' sweeping assertions of jurisdiction over ephemeral channels and drains as "tributaries." For example, courts have held that jurisdictional "tributaries" include the "intermittent flow of surface water through approximately 2.4 miles of natural streams and manmade ditches (paralleling and crossing under I–64)," *Treacy* v. *Newdunn Assoc.*, 344 F. 3d 407, 410 (CA4 2003); a "road-side ditch" whose water took "a winding, thirty-two-mile path to the Chesapeake Bay," *United States* v. *Deaton*, 332 F. 3d 698, 702 (CA4 2003); irrigation ditches and drains that intermittently connect to covered waters, *Community Assn. for Restoration of Environment* v. *Henry Bosma Dairy*, 305 F. 3d 943, 954–955 (CA9 2002); *Headwaters, Inc.* v. *Talent Irrigation Dist.*, 243 F. 3d 526, 534 (CA9 2001); and (most implausibly of all) the "washes and arroyos" of an "arid development site," located in the middle of the desert, through which "water courses . . . during periods of heavy rain," *Save Our Sonoran, Inc.* v. *Flowers*, 408 F. 3d 1113, 1118 (CA9 2005).[2]

These judicial constructions of "tributaries" are not outliers. Rather, they reflect the breadth of the Corps' determinations in the field. The Corps' enforcement practices vary somewhat from district to district because "the definitions used to make jurisdictional determinations" are deliberately left "vague." GAO Report 26; see also *id.*, at 22. But district offices of the Corps have treated, as

———————

[2] We are indebted to the *Sonoran* court for a famous exchange, from the movie Casablanca (Warner Bros. 1942), which portrays most vividly the absurdity of finding the desert filled with waters:

"'Captain Renault [Claude Rains]: "What in heaven's name brought you to Casablanca?"

"'Rick [Humphrey Bogart]: "My health. I came to Casablanca for the waters."

"'Captain Renault: "The waters? What waters? We're in the desert."

"'Rick: "I was misinformed.'" 408 F. 3d, at 1117.

"waters of the United States," such typically dry land features as "arroyos, coulees, and washes," as well as other "channels that might have little water flow in a given year." *Id.,* at 20–21. They have also applied that definition to such manmade, intermittently flowing features as "drain tiles, storm drains systems, and culverts." *Id.,* at 24 (footnote omitted).

In addition to "tributaries," the Corps and the lower courts have also continued to define "adjacent" wetlands broadly after *SWANCC*. For example, some of the Corps' district offices have concluded that wetlands are "adjacent" to covered waters if they are hydrologically connected "through directional sheet flow during storm events," GAO Report 18, or if they lie within the "100-year floodplain" of a body of water—that is, they are connected to the navigable water by flooding, on average, once every 100 years, *id.,* at 17, and n. 16. Others have concluded that presence within 200 feet of a tributary automatically renders a wetland "adjacent" and jurisdictional. *Id.,* at 19. And the Corps has successfully defended such theories of "adjacency" in the courts, even after *SWANCC*'s excision of "isolated" waters and wetlands from the Act's coverage. One court has held since *SWANCC* that wetlands separated from flood control channels by 70-foot-wide berms, atop which ran maintenance roads, had a "significant nexus" to covered waters because, *inter alia,* they lay "within the 100 year floodplain of tidal waters." *Baccarat Fremont Developers, LLC* v. *Army Corps of Engineers,* 425 F. 3d 1150, 1152, 1157 (CA9 2005). In one of the cases before us today, the Sixth Circuit held, in agreement with "[t]he majority of courts," that "while a hydrological connection between the non-navigable and navigable waters is required, there is no 'direct abutment' requirement" under *SWANCC* for "'adjacency.'" 376 F. 3d 629, 639 (2004) *(Rapanos II).* And even the most insubstantial hydrologic connection may be held to constitute a "signifi-

cant nexus." One court distinguished *SWANCC* on the ground that "a molecule of water residing in one of these pits or ponds [in *SWANCC*] could not mix with molecules from other bodies of water"—whereas, in the case before it, "water molecules currently present in the wetlands will inevitably flow towards and mix with water from connecting bodies," and "[a] drop of rainwater landing in the Site is certain to intermingle with water from the [nearby river]." *United States* v. *Rueth Development Co.*, 189 F. Supp. 2d 874, 877–878 (ND Ind. 2002).

## II

In these consolidated cases, we consider whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute "waters of the United States" within the meaning of the Act. Petitioners in No. 04–1034, the Rapanos and their affiliated businesses, deposited fill material without a permit into wetlands on three sites near Midland, Michigan: the "Salzburg site," the "Hines Road site," and the "Pine River site." The wetlands at the Salzburg site are connected to a man-made drain, which drains into Hoppler Creek, which flows into the Kawkawlin River, which empties into Saginaw Bay and Lake Huron. See Brief for United States in No. 04–1034, p. 11; 339 F. 3d, at 449. The wetlands at the Hines Road site are connected to something called the "Rose Drain," which has a surface connection to the Tittabawassee River. App. to Pet. for Cert. in No. 04–1034, pp. A23, B20. And the wetlands at the Pine River site have a surface connection to the Pine River, which flows into Lake Huron. *Id.*, at A23–A24, B26. It is not clear whether the connections between these wetlands and the nearby drains and ditches are continuous or intermittent, or whether the nearby drains and ditches contain continuous or merely occasional flows of water.

The United States brought civil enforcement proceedings against the Rapanos petitioners. The District Court found that the three described wetlands were "within federal jurisdiction" because they were "adjacent to other waters of the United States," and held petitioners liable for violations of the CWA at those sites. *Id.,* at B32–B35. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed, holding that there was federal jurisdiction over the wetlands at all three sites because "there were hydrological connections between all three sites and corresponding adjacent tributaries of navigable waters." 376 F. 3d, at 643.

Petitioners in No. 04–1384, the Carabells, were denied a permit to deposit fill material in a wetland located on a triangular parcel of land about one mile from Lake St. Clair. A man-made drainage ditch runs along one side of the wetland, separated from it by a 4-foot-wide man-made berm. The berm is largely or entirely impermeable to water and blocks drainage from the wetland, though it may permit occasional overflow to the ditch. The ditch empties into another ditch or a drain, which connects to Auvase Creek, which empties into Lake St. Clair. See App. to Pet. for Cert. in No. 04–1384, pp. 2a–3a.

After exhausting administrative appeals, the Carabell petitioners filed suit in the District Court, challenging the exercise of federal regulatory jurisdiction over their site. The District Court ruled that there was federal jurisdiction because the wetland "is adjacent to neighboring tributaries of navigable waters and has a significant nexus to 'waters of the United States.'" *Id.*, at 49a. Again the Sixth Circuit affirmed, holding that the Carabell wetland was "adjacent" to navigable waters. 391 F. 3d 704, 708 (2004) *(Carabell)*.

We granted certiorari and consolidated the cases, 546 U. S. ___ (2005), to decide whether these wetlands constitute "waters of the United States" under the Act, and if so,

whether the Act is constitutional.

### III

The Rapanos petitioners contend that the terms "navigable waters" and "waters of the United States" in the Act must be limited to the traditional definition of *The Daniel Ball*, which required that the "waters" be navigable in fact, or susceptible of being rendered so. See 10 Wall., at 563. But this definition cannot be applied wholesale to the CWA. The Act uses the phrase "navigable waters" as a *defined* term, and the definition is simply "the waters of the United States." 33 U. S. C. §1362(7). Moreover, the Act provides, in certain circumstances, for the substitution of state for federal jurisdiction over "navigable waters . . . *other than* those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . including wetlands adjacent thereto." §1344(g)(1) (emphasis added). This provision shows that the Act's term "navigable waters" includes something more than traditional navigable waters. We have twice stated that the meaning of "navigable waters" in the Act is broader than the traditional understanding of that term, *SWANCC*, 531 U. S., at 167; *Riverside Bayview*, 474 U. S., at 133.[3] We have also emphasized, however,

––––––––––

[3] One possibility, which we ultimately find unsatisfactory, is that the "other" waters covered by 33 U. S. C. §1344(g)(1) are strictly *intrastate* waters that are traditionally navigable. But it would be unreasonable to interpret "the waters of the United States" to include all and only traditional navigable waters, both interstate and intrastate. This would preserve the traditional import of the qualifier "navigable" in the *defined* term "navigable waters," at the cost of depriving the qualifier "of the United States" *in the definition* of all meaning. As traditionally understood, the latter qualifier excludes intrastate waters, whether navigable or not. See *The Daniel Ball*, 10 Wall. 557, 563 (1871). In *SWANCC*, we held that "navigable" retained something of its traditional import. 531 U. S., at 172. *A fortiori*, the phrase "of the United

that the qualifier "navigable" is not devoid of significance, *SWANCC, supra,* at 172.

We need not decide the precise extent to which the qualifiers "navigable" and "of the United States" restrict the coverage of the Act. Whatever the scope of these qualifiers, the CWA authorizes federal jurisdiction only over "waters." 33 U. S. C. §1362(7). The only natural definition of the term "waters," our prior and subsequent judicial constructions of it, clear evidence from other provisions of the statute, and this Court's canons of construction all confirm that "the waters of the United States" in §1362(7) cannot bear the expansive meaning that the Corps would give it.

The Corps' expansive approach might be arguable if the CSA defined "navigable waters" as "water of the United States." But "the waters of the United States" is something else. The use of the definite article ("the") and the plural number ("waters") show plainly that §1362(7) does not refer to water in general. In this form, "the waters" refers more narrowly to water "[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes," or "the flowing or moving masses, as of waves or floods, making up such streams or bodies." Webster's New International Dictionary 2882 (2d ed. 1954) (hereinafter Webster's Second).[4] On this definition, "the waters of the United States" include only relatively

─────────

States" in the definition retains some of its traditional meaning.

[4] JUSTICE KENNEDY observes, *post*, at 13 (opinion concurring in judgment), that the dictionary approves an alternative, somewhat poetic usage of "waters" as connoting "[a] flood or inundation; as the *waters* have fallen. 'The peril of *waters*, wind, and rocks.' *Shak*." Webster's Second 2882. It seems to us wholly unreasonable to interpret the statute as regulating only "floods" and "inundations" rather than traditional waterways—and strange to suppose that Congress had waxed Shakespearean in the definition section of an otherwise prosaic, indeed downright tedious, statute. The duller and more commonplace meaning is obviously intended.

permanent, standing or flowing bodies of water.[5]   The
definition refers to water as found in "streams," "oceans,"
"rivers," "lakes," and "bodies" of water "forming geographi-
cal features."   *Ibid.*   All of these terms connote continu-
ously present, fixed bodies of water, as opposed to ordinar-
ily dry channels through which water occasionally or
intermittently flows.   Even the least substantial of the
definition's terms, namely "streams," connotes a continu-
ous flow of water in a permanent channel—especially
when used in company with other terms such as "rivers,"
"lakes," and "oceans."[6]   None of these terms encompasses

––––––––––

[5] By describing "waters" as "relatively permanent," we do not necessar-
ily exclude streams, rivers, or lakes that might dry up in extraordinary
circumstances, such as drought.   We also do not necessarily exclude
*seasonal* rivers, which contain continuous flow during some months of
the year but no flow during dry months—such as the 290-day, continu-
ously flowing stream postulated by JUSTICE STEVENS' dissent (hereinaf-
ter the dissent), *post*, at 15.   Common sense and common usage distin-
guish between a wash and seasonal river.

Though scientifically precise distinctions between "perennial" and
"intermittent" flows are no doubt available, see, *e.g.*, Dept. of Interior,
U. S. Geological Survey, E. Hedman & W. Osterkamp, Streamflow
Characteristics Related to Channel Geometry of Streams in Western
United States 15 (1982) (Water-Supply Paper 2193), we have no occa-
sion in this litigation to decide exactly when the drying-up of a stream
bed is continuous and frequent enough to disqualify the channel as a
"wate[r] of the United States."   It suffices for present purposes that
channels containing permanent flow are plainly within the definition,
and that the dissent's "intermittent" and "ephemeral" streams, *post*, at
16 (opinion of STEVENS, J.)—that is, streams whose flow is "[c]oming
and going at intervals . . . [b]roken, fitful," Webster's Second 1296, or
"existing only, or no longer than, a day; diurnal . . . short-lived," *id.*, at
857—are not.

[6] The principal definition of "stream" likewise includes reference to
such permanent, geographically fixed bodies of water: "[a] current or
course of water or other fluid, flowing on the earth, as a *river, brook,
etc.*"   *Id.,* at 2493 (emphasis added).   The other definitions of "stream"
repeatedly emphasize the requirement of *continuous* flow: "[a] *steady
flow*, as of water, air, gas, or the like"; "[a]nything issuing or moving
with *continued succession* of parts"; "[a] *continued current* or course;

transitory puddles or ephemeral flows of water.

The restriction of "the waters of the United States" to exclude channels containing merely intermittent or ephemeral flow also accords with the commonsense under- standing of the term. In applying the definition to "ephemeral streams," "wet meadows," storm sewers and culverts, "directional sheet flow during storm events," drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert, the Corps has stretched the term "waters of the United States" beyond parody. The plain language of the statute simply does not authorize this "Land Is Waters" approach to federal jurisdiction.

In addition, the Act's use of the traditional phrase "navi- gable waters" (the defined term) further confirms that it confers jurisdiction only over relatively *permanent* bodies of water. The Act adopted that traditional term from its predecessor statutes. See *SWANCC*, 531 U. S., at 180 (STEVENS, J., dissenting). On the traditional understand- ing, "navigable waters" included only discrete *bodies* of water. For example, in *The Daniel Ball*, we used the terms "waters" and "rivers" interchangeably. 10 Wall., at 563. And in *Appalachian Electric*, we consistently referred to

———————

current; drift." *Ibid.* (emphases added). The definition of the verb form of "stream" contains a similar emphasis on continuity: "[t]o issue or flow in a stream; to issue freely or move in a *continuous flow or course*." *Ibid.* (emphasis added). On these definitions, therefore, the Corps' phrases "intermittent streams," 33 CFR §328.3(a)(3) (2004), and "ephemeral streams," 65 Fed. Reg. 12823 (2000), are—like Senator Bentsen's "'flowing gullies,'" *post*, at 16, n. 11 (opinion of STEVENS, J.)— useful oxymora. Properly speaking, such entities constitute extant "streams" only while they are "continuous[ly] flow[ing]"; and the usu- ally dry channels that contain them are never "streams." JUSTICE KENNEDY apparently concedes that "an intermittent flow can constitute a stream" only "*while it is flowing*," *post*, at 13 (emphasis added)— which would mean that the channel is a "water" covered by the Act only during those times when water flow actually occurs. But no one con- tends that federal jurisdiction appears and evaporates along with the water in such regularly dry channels.

the "navigable waters" as "waterways." 311 U. S., at 407–409. Plainly, because such "waters" had to be navigable in fact or susceptible of being rendered so, the term did not include ephemeral flows. As we noted in *SWANCC*, the traditional term "navigable waters"—even though defined as "the waters of the United States"—carries *some* of its original substance: "[I]t is one thing to give a word limited effect and quite another to give it no effect whatever." 531 U. S., at 172. That limited effect includes, at bare minimum, the ordinary presence of water.

Our subsequent interpretation of the phrase "the waters of the United States" in the CWA likewise confirms this limitation of its scope. In *Riverside Bayview*, we stated that the phrase in the Act referred primarily to "rivers, streams, and other *hydrographic features more conventionally identifiable as 'waters'*" than the wetlands adjacent to such features. 474 U. S., at 131 (emphasis added). We thus echoed the dictionary definition of "waters" as referring to "streams and bodies *forming geographical features* such as oceans, rivers, [and] lakes." Webster's Second 2882 (emphasis added). Though we upheld in that case the inclusion of wetlands abutting such a "hydrographic featur[e]"—principally due to the difficulty of drawing any clear boundary between the two, see 474 U. S., at 132; Part IV, *infra*—nowhere did we suggest that "the waters of the United States" should be expanded to include, in their own right, entities other than "hydrographic features more conventionally identifiable as 'waters.'" Likewise, in both *Riverside Bayview* and *SWANCC*, we repeatedly described the "navigable waters" covered by the Act as "open water" and "open waters." See *Riverside Bayview*, *supra,* at 132, and n. 8, 134; *SWANCC*, *supra,* at 167, 172. Under no rational interpretation are typically dry channels described as "*open* waters."

Most significant of all, the CWA itself categorizes the channels and conduits that typically carry intermittent

flows of water separately from "navigable waters," by including them in the definition of "'point source.'" The Act defines "'point source'" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U. S. C. §1362(14).  It also defines "'discharge of a pollutant'" as "any addition of any pollutant *to* navigable waters *from* any point source."  §1362(12)(A) (emphases added).  The definitions thus conceive of "point sources" and "navigable waters" as separate and distinct categories.  The definition of "discharge" would make little sense if the two categories were significantly overlapping.  The separate classification of "ditch[es], channel[s], and conduit[s]"—which are terms ordinarily used to describe the watercourses through which *intermittent* waters typically flow—shows that these are, by and large, *not* "waters of the United States."[7]

_____

[7] It is of course true, as the dissent and JUSTICE KENNEDY both observe, that ditches, channels, conduits and the like "can all hold water permanently as well as intermittently," *post*, at 17 (opinion of STEVENS, J.); see also *post*, at 14–15 (opinion of KENNEDY, J.).  But when they do, we usually refer to them as "rivers," "creeks," or "streams."  A permanently flooded ditch around a castle is technically a "ditch," but (because it is permanently filled with water) we normally describe it as a "moat."  See Webster's Second 1575.  And a permanently flooded man-made ditch used for navigation is normally described, not as a "ditch," but as a "canal."  See *id.,* at 388.  Likewise, an open channel through which water permanently flows is ordinarily described as a "stream," not as a "channel," because of the continuous presence of water.  This distinction is particularly apt in the context of a statute regulating *water* quality, rather than (for example) the shape of stream beds.  Cf. *Jennison* v. *Kirk*, 98 U. S. 453, 454–456 (1879) (referring to man-made channels as "ditches" when the alleged injury arose from physical damage to the *banks* of the ditch); *PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology*, 511 U. S. 700, 709 (1994) (referring to a water-filled tube as a "tunnel" in order to describe the *shape* of the

Moreover, only the foregoing definition of "waters" is consistent with the CWA's stated "policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . ." §1251(b). This statement of policy was included in the Act as enacted in 1972, see 86 Stat. 816, prior to the addition of the optional state administration program in the 1977 amendments, see 91 Stat. 1601. Thus the policy plainly referred to something beyond the subsequently added state administration program of 33 U. S. C. §1344(g)–(*l*). But the expansive theory advanced by the Corps, rather than "preserv[ing] the primary rights and responsibilities of the States," would have brought virtually all "plan[ning of] the development and use . . . of land and water resources" by the States under federal control. It is therefore an unlikely

_____

conveyance, not the fact that it was water-filled), both cited *post*, at 17, n. 12 (opinion of STEVENS, J.). On its only natural reading, such a statute that treats "waters" separately from "ditch[es], channel[s], tunnel[s], and conduit[s]," thereby distinguishes between continuously flowing "waters" and channels containing only an occasional or intermittent flow.

It is also true that highly artificial, manufactured, enclosed conveyance systems—such as "sewage treatment plants," *post*, at 15 (opinion of KENNEDY, J.), and the "mains, pipes, hydrants, machinery, buildings, and other appurtenances and incidents" of the city of Knoxville's "system of waterworks," *Knoxville Water Co.* v. *Knoxville*, 200 U. S. 22, 27 (1906), cited *post*, at 17, n. 12 (opinion of STEVENS, J.)—likely do not qualify as "waters of the United States," despite the fact that they may contain continuous flows of water. See *post*, at 15 (opinion of KENNEDY, J.); *post*, at 17, n. 12 (opinion of STEVENS, J.). But this does not contradict our interpretation, which asserts that relatively continuous flow is a *necessary* condition for qualification as a "water," not an *adequate* condition. Just as ordinary usage does not treat typically dry beds as "waters," so also it does not treat such elaborate, man-made, enclosed systems as "waters" on a par with "streams," "rivers," and "oceans."

reading of the phrase "the waters of the United States."[8]

Even if the phrase "the waters of the United States" were ambiguous as applied to intermittent flows, our own canons of construction would establish that the Corps' interpretation of the statute is impermissible. As we noted in *SWANCC*, the Government's expansive interpretation would "result in a significant impingement of the States' traditional and primary power over land and water use." 531 U. S., at 174. Regulation of land use, as through the issuance of the development permits sought by petitioners in both of these cases, is a quintessential state and local power. See *FERC* v. *Mississippi*, 456 U. S. 742, 768, n. 30 (1982); *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 44 (1994). The extensive federal jurisdiction urged by the Government would authorize the Corps to function as a *de facto* regulator of immense stretches of intrastate land—an authority the agency has shown its willingness to exercise with the scope of discretion that would befit a local zoning board. See 33 CFR §320.4(a)(1) (2004). We ordinarily expect a "clear and manifest" statement from Congress to authorize an unprecedented intrusion into traditional state authority. See *BFP* v. *Resolution Trust Corporation*, 511 U. S. 531, 544 (1994). The phrase "the waters of the United States" hardly qualifies.

Likewise, just as we noted in *SWANCC*, the Corps'

––––––––

[8] JUSTICE KENNEDY contends that the Corps' preservation of the "responsibilities and rights" of the States is adequately demonstrated by the fact that "33 States and the District of Columbia have filed an *amici* brief in this litigation" in favor of the Corps' interpretation, *post*, at 20. But it makes no difference to the *statute*'s stated purpose of preserving States' "rights and responsibilities," §1251(b), that some States wish to unburden themselves of them. Legislative and executive officers of the States may be content to leave "responsibilit[y]" with the Corps because it is attractive to shift to another entity controversial decisions disputed between politically powerful, rival interests. That, however, is not what the statute provides.

interpretation stretches the outer limits of Congress's commerce power and raises difficult questions about the ultimate scope of that power. See 531 U. S., at 173. (In developing the current regulations, the Corps consciously sought to extend its authority to the farthest reaches of the commerce power. See 42 Fed. Reg. 37127 (1977).) Even if the term "the waters of the United States" were ambiguous as applied to channels that sometimes host ephemeral flows of water (which it is not), we would expect a clearer statement from Congress to authorize an agency theory of jurisdiction that presses the envelope of constitutional validity. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988).[9]

In sum, on its only plausible interpretation, the phrase "the waters of the United States" includes only those relatively permanent, standing or continuously flowing bodies of water "forming geographic features" that are described in ordinary parlance as "streams[,] . . . oceans, rivers, [and] lakes." See Webster's Second 2882. The phrase does not include channels through which water

---

[9] JUSTICE KENNEDY objects that our reliance on these two clear-statement rules is inappropriate because "the plurality's interpretation does not fit the avoidance concerns that it raises," *post*, at 19—that is, because our resolution both eliminates some jurisdiction that is clearly constitutional and traditionally federal, and retains some that is questionably constitutional and traditionally local. But a clear-statement rule can carry one only so far as the statutory text permits. Our resolution, unlike JUSTICE KENNEDY's, keeps both the overinclusion and the underinclusion to the minimum consistent with the statutory text. JUSTICE KENNEDY's reading—despite disregarding the text—fares no better than ours as a precise "fit" for the "avoidance concerns" that he also acknowledges. He admits, *post*, at 25, that "the significant nexus requirement may not align perfectly with the traditional extent of federal authority" over navigable waters—an admission that "tests the limits of understatement," *Gonzales* v. *Oregon*, 126 S. Ct. 904, 932 (2005) (SCALIA, J., dissenting)—and it aligns even worse with the preservation of traditional state land-use regulation.

flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps' expansive interpretation of the "the waters of the United States" is thus not "based on a permissible construction of the statute." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 843 (1984).

## IV

In *Carabell*, the Sixth Circuit held that the nearby ditch constituted a "tributary" and thus a "water of the United States" under 33 CFR §328.3(a)(5) (2004). See 391 F. 3d, at 708–709. Likewise in *Rapanos*, the Sixth Circuit held that the nearby ditches were "tributaries" under §328(a)(5). 376 F. 3d, at 643. But *Rapanos II* also stated that, even if the ditches were not "waters of the United States," the wetlands were "adjacent" to *remote* traditional navigable waters in virtue of the wetlands' "hydrological connection" to them. See *id.*, at 639–640. This statement reflects the practice of the Corps' district offices, which may "assert jurisdiction over a wetland without regulating the ditch connecting it to a water of the United States." GAO Report 23. We therefore address in this Part whether a wetland may be considered "adjacent to" remote "waters of the United States," because of a mere hydrologic connection to them.

In *Riverside Bayview*, we noted the textual difficulty in including "wetlands" as a subset of "waters": "On a purely linguistic level, it may appear unreasonable to classify 'lands,' wet or otherwise, as 'waters.'" 474 U. S., at 132. We acknowledged, however, that there was an inherent ambiguity in drawing the boundaries of any "waters":

"[T]he Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between

open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs—in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of 'waters' is far from obvious." *Ibid.*

Because of this inherent ambiguity, we deferred to the agency's inclusion of wetlands "actually abut[ting]" traditional navigable waters: "Faced with such a problem of defining the bounds of its regulatory authority," we held, the agency could reasonably conclude that a wetland that "adjoin[ed]" waters of the United States is itself a part of those waters. *Id.,* at 132, 135, and n. 9. The difficulty of delineating the boundary between water and land was central to our reasoning in the case: "In view of the breadth of federal regulatory authority contemplated by the Act itself and *the inherent difficulties of defining precise bounds to regulable waters*, the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act." *Id.*, at 134 (emphasis added).[10]

_____

[10] Since the wetlands at issue in *Riverside Bayview* actually abutted waters of the United States, the case could not possibly have held that merely "neighboring" wetlands came within the Corps' jurisdiction. *Obiter* approval of that proposition might be inferred, however, from the opinion's quotation without comment of a statement by the Corps describing covered "adjacent" wetlands as those "'that form the border of *or are in reasonable proximity to* other waters of the United States.'" 474 U. S., at 134 (quoting 42 Fed. Reg. 37128 (1977); emphasis added). The opinion immediately reiterated, however, that adjacent wetlands could be regarded as "the waters of the United States" in view of "the inherent difficulties of defining precise bounds to regulable waters," 474 U. S., at 134—a rationale that would have no application to physically separated "neighboring" wetlands. Given that the wetlands at issue in *Riverside Bayview* themselves "actually abut[ted] on a navigable waterway," *id.*, at 135; given that our opinion recognized that unconnected wetlands could not naturally be characterized as "'waters'" at

When we characterized the holding of *Riverside Bayview* in *SWANCC*, we referred to the close connection between waters and the wetlands that they gradually blend into: "It was the *significant nexus* between the wetlands and 'navigable waters' that informed our reading of the CWA in *Riverside Bayview Homes*." 531 U. S., at 167 (emphasis added). In particular, *SWANCC* rejected the notion that the ecological considerations upon which the Corps relied in *Riverside Bayview*—and upon which the dissent repeatedly relies today, see *post*, at 10–11, 12, 13–14, 15, 18–19, 21–22, 24–25—provided an *independent* basis for including entities like "wetlands" (or "ephemeral streams") within the phrase "the waters of the United States." *SWANCC* found such ecological considerations irrelevant to the question whether physically isolated waters come within the Corps' jurisdiction. It thus confirmed that *Riverside Bayview* rested upon the inherent ambiguity in defining where water ends and abutting ("adjacent") wetlands begin, permitting the Corps' reliance on ecological considerations *only to resolve that ambiguity* in favor of treating all abutting wetlands as waters. Isolated ponds were not "waters of the United States" in their own right, see 531 U. S., at 167, 171, and presented no boundary-drawing problem that would have justified the invocation of ecological factors to treat them as such.

Therefore, *only* those wetlands with a continuous surface connection to bodies that are "waters of the United States" in their own right, so that there is no clear demarcation between "waters" and wetlands, are "adjacent to"

---

all, *id.*, at 132; and given the repeated reference to the difficulty of determining where waters end and wetlands begin; the most natural reading of the opinion is that a wetlands' mere "reasonable proximity" to waters of the United States is not enough to confer Corps jurisdiction. In any event, as discussed in our immediately following text, any possible ambiguity has been eliminated by *SWANCC,* 531 U. S. 159 (2001).

such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to "waters of the United States" do not implicate the boundary-drawing problem of *Riverside Bayview*, and thus lack the necessary connection to covered waters that we described as a "significant nexus" in *SWANCC*. 531 U. S., at 167. Thus, establishing that wetlands such as those at the Rapanos and Carabell sites are covered by the Act requires two findings: First, that the adjacent channel contains a "wate[r] of the United States," (*i.e.,* a relatively permanent body of water connected to traditional inter-state navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the "water" ends and the "wetland" begins.

V

Respondents and their *amici* urge that such restrictions on the scope of "navigable waters" will frustrate enforce-ment against traditional water polluters under 33 U. S. C. §§1311 and 1342. Because the same definition of "naviga-ble waters" applies to the entire statute, respondents con-tend that water polluters will be able to evade the permit-ting requirement of §1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters. See Tr. of Oral Arg. 74–75.

That is not so. Though we do not decide this issue, there is no reason to suppose that our construction today signifi-cantly affects the enforcement of §1342, inasmuch as lower courts applying §1342 have not characterized intermittent channels as "waters of the United States." The Act does not forbid the "addition of any pollutant *directly* to navi-gable waters from any point source," but rather the "addi-tion of any pollutant *to* navigable waters." §1362(12)(A) (emphasis added); §1311(a). Thus, from the time of the CWA's enactment, lower courts have held that the dis-

charge into intermittent channels of any pollutant *that naturally washes downstream* likely violates §1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between. *United States* v. *Velsicol Chemical Corp.*, 438 F. Supp. 945, 946–947 (WD Tenn. 1976) (a municipal sewer system separated the "point source" and covered navigable waters). See also *Sierra Club* v. *El Paso Gold Mines, Inc.*, 421 F. 3d 1133, 1137, 1141 (CA10 2005) (2.5 miles of tunnel separated the "point source" and "navigable waters").

In fact, many courts have held that such upstream, intermittently flowing channels themselves constitute "point sources" under the Act. The definition of "point source" includes "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U. S. C. §1362(14). We have held that the Act "makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *South Fla. Water Management Dist.* v. *Miccosukee Tribe*, 541 U. S. 95, 105 (2004). Cases holding the intervening channel to be a point source include *United States* v. *Ortiz*, 427 F. 3d 1278, 1281 (CA10 2005) (a storm drain that carried flushed chemicals from a toilet to the Colorado River was a "point source"), and *Dague* v. *Burlington*, 935 F. 2d 1343, 1354–1355 (CA2 1991) (a culvert connecting two bodies of navigable water was a "point source"), rev'd on other grounds, 505 U. S. 557 (1992). Some courts have even adopted both the "indirect discharge" rationale and the "point source" rationale in the alternative, applied to the same facts. See, *e.g.*, *Concerned Area Residents for Environment* v. *Southview Farm*, 34 F. 3d 114, 118–119 (CA2 1994). On either view, however, the lower courts have seen no need to classify the inter-

vening conduits as "waters of the United States."

In contrast to the pollutants normally covered by the permitting requirement of §1342(a), "dredged or fill material," which is typically deposited for the sole purpose of staying put, does not normally wash downstream,[11] and thus does not normally constitute an "addition . . . to navigable waters" when deposited in upstream isolated wetlands. §§1344(a), 1362(12). The Act recognizes this distinction by providing a separate permitting program for such discharges in §1344(a). It does not appear, therefore, that the interpretation we adopt today significantly reduces the scope of §1342 of the Act.

Respondents also urge that the narrower interpretation of "waters" will impose a more difficult burden of proof in enforcement proceedings under §§1311(a) and 1342(a), by requiring the agency to demonstrate the downstream flow of the pollutant along the intermittent channel to tradi-

———————

[11] The dissent argues that "the very existence of words like 'alluvium' and 'silt' in our language suggests that at least some [dredged or fill material] makes its way downstream," *post*, at 22 (citation omitted). See also *post*, at 17 (opinion of KENNEDY, J.). By contrast, *amici* cite multiple empirical analyses that contradict the dissent's philological approach to sediment erosion—including one which concludes that "[t]he idea that the discharge of dredged or fill material into isolated waters, ephemeral drains or non-tidal ditches will pollute navigable waters located any appreciable distance from them lacks credibility." R. Pierce, Technical Principles Related to Establishing the Limits of Jurisdiction for Section 404 of the Clean Water Act 34–40 (Apr. 2003), available at www.wetlandtraining.com/tpreljscwa.pdf, cited in Brief for International Council of Shopping Centers et al. as *Amici Curiae* 26–27; Brief for Pulte Homes, Inc., et al. as *Amici Curiae* 20–21; Brief for Foundation for Environmental and Economic Progress et al. as *Amici Curiae* 29, and n. 53 ("Fill material does not migrate"). Such scientific analysis is entirely unnecessary, however, to reach the unremarkable conclusion that the deposit of *mobile* pollutants into upstream ephemeral channels is naturally described as an "addition . . . to navigable waters," 33 U. S. C. §1362(12), while the deposit of *stationary* fill material generally is not.

tional "waters." See Tr. of Oral Arg. 57. But, as noted above, the lower courts do not generally rely on characterization of intervening channels as "waters of the United States" in applying §1311 to the traditional pollutants subject to §1342. Moreover, the proof of downstream flow of pollutants required under §1342 appears substantially similar, if not identical, to the proof of a hydrologic connection that would be required, on the Sixth Circuit's theory of jurisdiction, to prove that an upstream channel or wetland is a "wate[r] of the United States." See *Rapanos II*, 376 F. 3d, at 639. Compare, *e.g.*, App. to Pet. for Cert. in No. 04–1034, at B11, B20, B26 (testimony of hydrologic connections based on observation of surface water connections), with *Southview Farm*, *supra,* at 118–121 (testimony of discharges based on observation of the flow of polluted water). In either case, the agency must prove that the contaminant-laden waters ultimately reach covered waters.

Finally, respondents and many *amici* admonish that narrowing the definition of "the waters of the United States" will hamper federal efforts to preserve the Nation's wetlands. It is not clear that the state and local conservation efforts that the CWA explicitly calls for, see 33 U. S. C. §1251(b), are in any way inadequate for the goal of preservation. In any event, a Comprehensive National Wetlands Protection Act is not before us, and the "wis[dom]" of such a statute, *post*, at 19 (opinion of STEVENS, J.), is beyond our ken. What is clear, however, is that Congress did not enact one when it granted the Corps jurisdiction over only "the *waters* of the United States."

## VI

In an opinion long on praise of environmental protection and notably short on analysis of the statutory text and structure, the dissent would hold that "the waters of the United States" include any wetlands "adjacent" (no matter

how broadly defined) to "tributaries" (again, no matter
how broadly defined) of traditional navigable waters. For
legal support of its policy-laden conclusion, the dissent
relies exclusively on two sources: "[o]ur unanimous opin-
ion in *Riverside Bayview,*" *post*, at 6; and "Congress' delib-
erate acquiescence in the Corps' regulations in 1977," *post*,
at 11. Each of these is demonstrably inadequate to sup-
port the apparently limitless scope that the dissent would
permit the Corps to give to the Act.

A

The dissent's assertion that *Riverside Bayview* "squarely
controls these cases," *post*, at 6, is wholly implausible.
First, *Riverside Bayview* could not possibly support the
dissent's acceptance of the Corps' inclusion of dry beds as
"tributaries," *post*, at 19, because the definition of tributar-
ies was not at issue in that case. *Riverside Bayview* ad-
dressed only the Act's inclusion of wetlands abutting
navigable-in-fact waters, and said nothing at all about
what non-navigable tributaries the Act might also cover.

*Riverside Bayview* likewise provides no support for the
dissent's complacent acceptance of the Corps' definition of
"adjacent," which (as noted above) has been extended
beyond reason to include, *inter alia*, the 100-year flood-
plain of covered waters. See *supra*, at 9. The dissent
notes that *Riverside Bayview* quoted without comment the
Corps' description of "adjacent" wetlands as those "that
form the border of or are in reasonable proximity to other
waters of the United States." *Post*, at 8 (citing 474 U. S.,
at 134 (quoting 42 Fed. Reg. 37128)). As we have already
discussed, this quotation provides no support for the inclu-
sion of physically unconnected wetlands as covered "wa-
ters." See *supra*, at 22–23, n. 10. The dissent relies prin-
cipally on a footnote in *Riverside Bayview* recognizing that
"'not every adjacent wetland is of great importance to the
environment of adjoining bodies of water,'" and that all

"'adjacent'" wetlands are nevertheless covered by the Act, *post*, at 8 (quoting 474 U. S., at 135, n. 9). Of course, this footnote says *nothing* to support the dissent's broad definition of "adjacent"—quite the contrary, the quoted sentence uses "adjacent" and "adjoining" *interchangeably*, and the footnote qualifies a sentence holding that the wetland was covered "*[b]ecause*" it "actually abut[ted] on a navigable waterway." *Id.*, at 135 (emphasis added). Moreover, that footnote's assertion that the Act may be interpreted to include even those adjoining wetlands that are "lacking in importance to the aquatic environment," *id.*, at 135, n. 9, confirms that the scope of ambiguity of "the waters of the United States" is determined by a wetland's *physical connection* to covered waters, *not* its ecological relationship thereto.

The dissent reasons (1) that *Riverside Bayview* held that "the waters of the United States" include "adjacent wetlands," and (2) we must defer to the Corps' interpretation of the ambiguous word "adjacent." *Post*, at 20–21. But this is mere legerdemain. The phrase "adjacent wetlands" is not part of the statutory definition that the Corps is authorized to interpret, which refers only to "the waters of the United States," 33 U. S. C. §1362(7).[12] In expounding the term "adjacent" as used in *Riverside Bayview*, we are explaining *our own* prior use of that word to interpret the definitional phrase "the waters of the United States."

––––––––––

[12] Nor does the passing reference to "wetlands adjacent thereto" in §1344(g)(1) purport to expand that statutory definition. As the dissent concedes, *post*, at 20, that reference merely confirms that the statutory definition can be read to include *some* wetlands—namely, those that directly "abut" covered waters. *Riverside Bayview* explicitly acknowledged that §1344(g)(1) "does not conclusively determine the construction to be placed on the use of the term 'waters' elsewhere in the Act *(particularly in [§1362(7)], which contains the relevant definition of 'navigable waters');* however, . . . it does at least suggest strongly that the term 'waters' as used in the Act *does not necessarily exclude* 'wetlands.'" 474 U. S., at 138, n. 11 (emphases added).

However ambiguous the term may be in the abstract, as we have explained earlier, "adjacent" as used in *Riverside Bayview* is not ambiguous between "physically abutting" and merely "nearby." See *supra*, at 21–23.

The dissent would distinguish *SWANCC* on the ground that it "had nothing to say about wetlands," *post*, at 9— *i.e.,* it concerned "isolated *ponds*" rather than isolated *wetlands*. This is the ultimate distinction without a difference. If isolated "permanent and seasonal ponds of varying size . . . and depth," 531 U. S., at 163—which, after all, might at least be described as "waters" in their own right—did not constitute "waters of the United States," *a fortiori,* isolated swampy *lands* do not constitute "waters of the United States." See also 474 U. S., at 132. As the author of today's dissent has written, "[i]f, as I believe, actually navigable waters lie at the very heart of Congress' commerce power and 'isolated,' nonnavigable waters lie closer to . . . the margin, 'isolated wetlands,' which are themselves only marginally 'waters,' are the most marginal category of 'waters of the United States' potentially covered by the statute." 531 U. S., at 187, n. 13 (STEVENS, J., dissenting).

The only other ground that the dissent offers to distinguish *SWANCC* is that, unlike the ponds in *SWANCC*, the wetlands in these cases are "adjacent to navigable bodies of water and their tributaries"—where "adjacent" may be interpreted who-knows-how broadly. It is not clear why roughly defined physical proximity should make such a difference—without actual abutment, it raises no boundary-drawing ambiguity, and it is undoubtedly a poor proxy for ecological significance. In fact, though the dissent is careful to restrict its discussion to wetlands "adjacent" to tributaries, its *reasons* for including those wetlands are strictly ecological—such wetlands would be included because they "serve . . . important water quality roles," *post*, at 11, and "play important roles in the watershed," *post*, at

18–19. This reasoning would swiftly overwhelm *SWANCC* altogether; after all, the ponds at issue in *SWANCC* could, no less than the wetlands in these cases, "offer 'nesting, spawning, rearing and resting sites for aquatic or land species,'" and "'serve as valuable storage areas for storm and flood waters,'" *post*, at 9–10. The dissent's exclusive focus on ecological factors, combined with its total deference to the Corps' ecological judgments, would permit the Corps to regulate the entire country as "waters of the United States."

B

Absent a plausible ground in our case law for its sweeping position, the dissent relies heavily on "Congress' deliberate acquiescence in the Corps' regulations in 1977," *post*, at 11—noting that "[w]e found [this acquiescence] significant in *Riverside Bayview*," and even "acknowledged in *SWANCC*" that we had done so, *post*, at 12. *SWANCC* "acknowledged" that *Riverside Bayview* had relied on congressional acquiescence only to criticize that reliance. It reasserted in no uncertain terms our oft-expressed skepticism towards reading the tea leaves of congressional inaction:

> "Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care. Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. . . . The relationship between the actions and inactions of the 95th Congress and the intent of the 92d Congress in passing [§1344(a)] is also considerably attenuated. Because subsequent history is less illuminating than the contemporaneous evidence, respondents face a difficult task in overcoming the plain text and import of [§1344(a)]." 531 U. S., at 169 (citations, internal quotation marks, and footnote omitted).

Congress takes no governmental action except by legislation. What the dissent refers to as "Congress' deliberate acquiescence" should more appropriately be called Congress's failure to express any opinion. We have no idea whether the Members' failure to act in 1977 was attributable to their belief that the Corps' regulations were correct, or rather to their belief that the courts would eliminate any excesses, or indeed simply to their unwillingness to confront the environmental lobby. To be sure, we have sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the "*precise* issue" presented before the Court, *Bob Jones Univ.* v. *United States*, 461 U. S. 574, 600 (1983) (emphasis added). However, "[a]bsent such *overwhelming evidence* of acquiescence, we are loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *SWANCC, supra,* at 169, n. 5 (emphasis added).

The dissent falls far short of producing "overwhelming evidence" that Congress considered and failed to act upon the "precise issue" before the Court today—namely, what constitutes an "adjacent" wetland covered by the Act. Citing *Riverside Bayview*'s account of the 1977 debates, the dissent claims nothing more than that Congress "conducted extensive debates about the Corps' regulatory jurisdiction over wetlands [and] rejected efforts to limit that jurisdiction . . . ." *Post*, at 11. In fact, even that vague description goes too far. As recounted in *Riverside Bayview*, the 1977 debates concerned a proposal to "limi[t] the Corps' authority under [§1344] to waters navigable in fact and their adjacent wetlands (defined as wetlands periodically inundated by contiguous navigable waters)," 474 U. S., at 136. In rejecting this proposal, Congress merely failed to enact a limitation of "waters" to include only navigable-in-fact waters—an interpretation we affirmatively reject today, see *supra*, at 12—and a definition

of wetlands based on "periodi[c] inundat[ion]" that appears
almost nowhere in the briefs or opinions of these cases.[13]
No plausible interpretation of this legislative inaction can
construe it as an implied endorsement of every jot and
tittle of the Corps' 1977 regulations. In fact, *Riverside
Bayview* itself relied on this legislative inaction only as "at
least some evidence of the reasonableness" of the agency's
inclusion of adjacent wetlands under the Act, 474 U. S., at
137, and for the observation that "even those who would
have restricted the reach of the Corps' jurisdiction" would
not have excised adjacent wetlands, *ibid.* Both of these

---

[13] The sole exception is in JUSTICE KENNEDY's opinion, which argues
that *Riverside Bayview* rejected our physical-connection requirement by
accepting as a given that *any* wetland formed by inundation from
covered waters (whether or not continuously connected to them) is
covered by the Act: "The Court in *Riverside Bayview* . . . did not suggest
that a flood-based origin would not support jurisdiction; indeed, it
presumed the opposite. See 474 U. S., at 134 (noting that the Corps'
view was valid '*even* for wetlands that are not the result of flooding or
permeation' (emphasis added))." *Post*, at 16. Of course JUSTICE
KENNEDY himself fails to observe this supposed presumption, since his
"significant nexus" test makes no exception for wetlands created by
inundation. In any event, the language from *Riverside Bayview* in
JUSTICE KENNEDY's parenthetical is wrenched out of context. The
sentence which JUSTICE KENNEDY quotes in part immediately followed
the Court's conclusion that "adjacent" wetlands are included because of
"the inherent difficulties of defining precise bounds to regulable wa-
ters," 474 U. S., at 134. And the full sentence reads as follows: "This
holds true even for wetlands that are not the result of flooding or
permeation by water having its source in *adjacent* bodies of open
water," *ibid.* (emphasis added). Clearly, the "wetlands" referred to in
the sentence are only "adjacent" wetlands—namely, those with the
continuous physical connection that the rest of the *Riverside Bayview*
opinion required, see *supra*, at 21–23. Thus, it is evident that the
quoted language was not at all a rejection of the physical-connection
requirement, but rather a rejection of the alternative position (which
had been adopted by the lower court in that case, see *id.*, at 125) that
the *only* covered wetlands are those created by inundation. As long as
the wetland is "adjacent" to covered waters, said *Riverside Bayview*, its
creation *vel non* by inundation is irrelevant.

conclusions are perfectly consistent with our interpreta-
tion, and neither illuminates the disputed question of
what constitutes an "adjacent" wetland.

C

In a curious appeal to entrenched Executive error, the
dissent contends that "the appropriateness of the Corps'
30-year implementation of the Clean Water Act should be
addressed to Congress or the Corps rather than to the
Judiciary." *Post,* at 14; see also *post*, at 2, 22. Surely this
is a novel principle of administrative law—a sort of 30-
year adverse possession that insulates disregard of statu-
tory text from judicial review. It deservedly has no prece-
dent in our jurisprudence. We did not invoke such a prin-
ciple in *SWANCC*, when we invalidated one aspect of the
Corps' implementation.

The dissent contends that "[b]ecause there is ambiguity
in the phrase 'waters of the United States' and because
interpreting it broadly to cover such ditches and streams
advances the purpose of the Act, the Corps' approach
should command our deference." *Post,* at 19. Two defects
in a single sentence: "[W]aters of the United States" is in
*some* respects ambiguous. The *scope* of that ambiguity,
however, does not conceivably extend to whether storm
drains and dry ditches are "waters," and hence does not
support the Corps' interpretation. And as for advancing
"the purpose of the Act": We have often criticized that last
resort of extravagant interpretation, noting that no law
pursues its purpose at all costs, and that the textual limi-
tations upon a law's scope are no less a part of its "pur-
pose" than its substantive authorizations. See, *e.g.*, *Direc-
tor, Office of Workers' Compensation Programs* v. *Newport
News Shipbuilding & Dry Dock Co.*, 514 U. S. 122, 135–
136 (1995).

Finally, we could not agree more with the dissent's
statement, *post,* at 14, that "[w]hether the benefits of

particular conservation measures outweigh their costs is a
classic question of public policy that should not be an-
swered by appointed judges." Neither, however, should it
be answered by appointed officers of the Corps of Engi-
neers in contradiction of congressional direction. It is the
dissent's opinion, and not ours, which appeals not to a
reasonable interpretation of enacted text, but to the great
environmental benefits that a patently unreasonable
interpretation can achieve. We have begun our discussion
by mentioning, to be sure, the high costs imposed by that
interpretation—but they are in no way the basis for our
decision, which rests, plainly and simply, upon the limited
meaning that can be borne by the phrase "waters of the
United States."

## VII

JUSTICE KENNEDY's opinion concludes that our reading
of the Act "is inconsistent with its text, structure, and
purpose." *Post,* at 19. His own opinion, however, leaves
the Act's "text" and "structure" virtually unaddressed, and
rests its case upon an interpretation of the phrase "signifi-
cant nexus," *ibid.*, which appears in one of our opinions.

To begin with, JUSTICE KENNEDY's reading of "signifi-
cant nexus" bears no easily recognizable relation to either
the case that used it *(SWANCC)* or to the earlier case that
that case purported to be interpreting *(Riverside Bayview).*
To establish a "significant nexus," JUSTICE KENNEDY
would require the Corps to "establish . . . on a case-by-case
basis" that wetlands adjacent to nonnavigable tributaries
"significantly affect the chemical, physical, and biological
integrity of other covered waters more readily understood
as 'navigable.'" *Post,* at 25, 23. This standard certainly
does not come from *Riverside Bayview,* which explicitly
rejected such case-by-case determinations of ecological
significance for the *jurisdictional* question whether a
wetland is covered, holding instead that *all* physically

connected wetlands are covered. 474 U. S., at 135, n. 9. It is true enough that one reason for accepting that physical-connection criterion was the likelihood that a physically connected wetland would have an ecological effect upon the adjacent waters. But case-by-case determination of ecological effect *was not the test*. Likewise, that test cannot be derived from *SWANCC*'s characterization of *Riverside Bayview*, which emphasized that the wetlands which possessed a "significant nexus" in that earlier case "actually abutted on a navigable waterway," 531 U. S., at 167, and which *specifically rejected* the argument that physically unconnected ponds could be included based on their ecological connection to covered waters. In fact, JUSTICE KENNEDY acknowledges that neither *Riverside Bayview* nor *SWANCC* required, for wetlands abutting navigable-in-fact waters, the case-by-case ecological determination that he proposes for wetlands that neighbor nonnavigable tributaries. See *post*, at 23. Thus, JUSTICE KENNEDY misreads *SWANCC's* "significant nexus" statement as mischaracterizing *Riverside Bayview* to adopt a case-by-case test of ecological significance; and then transfers that standard to a context that *Riverside Bayview* expressly declined to address (namely, wetlands nearby non-navigable tributaries); while all the time *conceding* that this standard does not apply in the context that *Riverside Bayview did* address (wetlands abutting navigable water-ways). Truly, this is "turtles all the way down."[14]

_____

[14] The allusion is to a classic story told in different forms and attributed to various authors. See, *e.g.,* Geertz, Thick Description: Toward an Interpretive Theory of Culture, in The Interpretation of Cultures 28–29 (1973). In our favored version, an Eastern guru affirms that the earth is supported on the back of a tiger. When asked what supports the tiger, he says it stands upon an elephant; and when asked what supports the elephant he says it is a giant turtle. When asked, finally, what supports the giant turtle, he is briefly taken aback, but quickly replies "Ah, after that it is turtles all the way down."

But misreading our prior decisions is not the principal problem. The principal problem is reading them in utter isolation from the text of the Act. One would think, after reading JUSTICE KENNEDY's exegesis, that the crucial provision of the text of the CWA was a jurisdictional requirement of "significant nexus" between wetlands and navigable waters. In fact, however, that phrase appears nowhere in the Act, but is taken from *SWANCC*'s cryptic characterization of the holding of *Riverside Bayview*. *Our* interpretation of the phrase is both consistent with those opinions *and* compatible with what the Act *does* establish as the jurisdictional criterion: "waters of the United States." Wetlands are "waters of the United States" if they bear the "significant nexus" of physical connection, which makes them as a practical matter *indistinguishable* from waters of the United States. What other nexus could *conceivably* cause them to *be* "waters of the United States"? JUSTICE KENNEDY's test is that they, "either alone or in combination with similarly situated lands in the region, significantly *affect* the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable,'" *post,* at 23 (emphasis added). But what possible linguistic usage would accept that whatever (alone or in combination) *affects* waters of the United States *is* waters of the United States?

Only by ignoring the text of the statute and by assuming that the phrase of *SWANCC* ("significant nexus") can properly be interpreted in isolation from that text does JUSTICE KENNEDY reach the conclusion he has arrived at. Instead of limiting its meaning by reference to the text it was applying, he purports to do so by reference to what he calls the "purpose" of the statute. Its purpose is to clean up the waters of the United States, and therefore anything that might "significantly affect" the purity of those waters bears a "significant nexus" to those waters, and thus (he never says this, but the text of the statute demands that

he mean it) *is* those waters.  This is the familiar tactic of substituting the purpose of the statute for its text, freeing the Court to write a different statute that achieves the same purpose.  To begin with, as we have discussed earlier, clean water is not the *only* purpose of the statute.  So is the preservation of primary state responsibility for ordinary land-use decisions.    33  U. S. C.  §1251(b).  JUSTICE KENNEDY's test takes no account of this purpose.  More fundamentally, however, the test simply rewrites the statute, using for that purpose the gimmick of "significant nexus."  It would have been an easy matter for Congress to give the Corps jurisdiction over all wetlands (or, for that matter, all dry lands) that "significantly affect the chemical, physical, and biological integrity of" waters of the United States.  It did not do that, but instead explicitly limited jurisdiction to "waters of the United States."

JUSTICE KENNEDY's disposition would disallow some of the Corps' excesses, and in that respect is a more moderate flouting of statutory command than JUSTICE STEVENS'.[15]   In another respect, however, it is more extreme.  At least JUSTICE STEVENS can blame his implausible reading of the statute upon the Corps.  His error con-

––––––––––

[15] It is unclear *how much* more moderate the flouting is, since JUSTICE KENNEDY's "significant nexus" standard is perfectly opaque.  When, exactly, does a wetland "significantly affect" covered waters, and when are its effects "in contrast . . . speculative or insubstantial"? *Post*, at 23.  JUSTICE KENNEDY does not tell us clearly—except to suggest, *post*, at 25,  that "'"isolated" is generally a matter of degree'" (quoting Leibowitz & Nadeau, Isolated Wetlands: State-of-the-Science and Future Directions, 23 Wetlands 663, 669 (2003)).  As the dissent hopefully observes, *post*, at 24, such an unverifiable standard is not likely to constrain an agency whose disregard for the statutory language has been so long manifested.  In fact, by stating that "[i]n both the consolidated cases before the Court the record contains evidence suggesting the possible existence of a significant nexus according to the principles outlined above," *post*, at 26, JUSTICE KENNEDY tips a wink at the agency, inviting it to try its same expansive reading again.

Opinion of SCALIA, J.

sists of giving that agency more deference than reason permits. JUSTICE KENNEDY, however, has devised his new statute all on his own. It purports to be, not a grudging acceptance of an agency's close-to-the-edge expansion of its own powers, but rather *the* most reasonable interpretation of the law. It is far from that, unless whatever affects waters is waters.

## VIII

Because the Sixth Circuit applied the wrong standard to determine if these wetlands are covered "waters of the United States," and because of the paucity of the record in both of these cases, the lower courts should determine, in the first instance, whether the ditches or drains near each wetland are "waters" in the ordinary sense of containing a relatively permanent flow; and (if they are) whether the wetlands in question are "adjacent" to these "waters" in the sense of possessing a continuous surface connection that creates the boundary-drawing problem we addressed in *Riverside Bayview*.

\*    \*    \*

We vacate the judgments of the Sixth Circuit in both No. 04–1034 and No. 04–1384, and remand both cases for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

Nos. 04–1034 and 04–1384

————

JOHN A. RAPANOS, ET UX., ET AL., PETITIONERS
04–1034                    *v.*
UNITED STATES

JUNE CARABELL ET AL., PETITIONERS
04–1384                    *v.*
UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 19, 2006]

CHIEF JUSTICE ROBERTS, concurring.

Five years ago, this Court rejected the position of the Army Corps of Engineers on the scope of its authority to regulate wetlands under the Clean Water Act, 86 Stat. 816, as amended, 33 U. S. C. §1251 *et seq. Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159 (2001) *(SWANCC).* The Corps had taken the view that its authority was essentially limitless; this Court explained that such a boundless view was inconsistent with the limiting terms Congress had used in the Act. *Id.,* at 167–174.

In response to the *SWANCC* decision, the Corps and the Environmental Protection Agency (EPA) initiated a rulemaking to consider "issues associated with the scope of waters that are subject to the Clean Water Act (CWA), in light of the U. S. Supreme Court decision in *[SWANCC]*." 68 Fed. Reg. 1991 (2003). The "goal of the agencies" was "to develop proposed regulations that will further the public interest by clarifying what waters are subject to

CWA jurisdiction and affording full protection to these waters through an appropriate focus of Federal and State resources consistent with the CWA." *Ibid.*

Agencies delegated rulemaking authority under a statute such as the Clean Water Act are afforded generous leeway by the courts in interpreting the statute they are entrusted to administer. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–845 (1984). Given the broad, somewhat ambiguous, but nonetheless clearly limiting terms Congress employed in the Clean Water Act, the Corps and the EPA would have enjoyed plenty of room to operate in developing *some* notion of an outer bound to the reach of their authority.

The proposed rulemaking went nowhere. Rather than refining its view of its authority in light of our decision in *SWANCC*, and providing guidance meriting deference under our generous standards, the Corps chose to adhere to its essentially boundless view of the scope of its power. The upshot today is another defeat for the agency.

It is unfortunate that no opinion commands a majority of the Court on precisely how to read Congress' limits on the reach of the Clean Water Act. Lower courts and regulated entities will now have to feel their way on a case-by-case basis. This situation is certainly not unprecedented. See *Grutter* v. *Bollinger,* 539 U. S. 306, 325 (2003) (discussing *Marks* v. *United States,* 430 U. S. 188 (1977)). What is unusual in this instance, perhaps, is how readily the situation could have been avoided.*

———————

*The scope of the proposed rulemaking was not as narrow as JUSTICE STEVENS suggests, *post*, at 10, n. 4 (dissenting opinion). See 68 Fed. Reg. 1994 (2003) ("Additionally, we invite your views as to whether any other revisions are needed to the existing regulations on which waters are jurisdictional under the CWA"); *id.,* at 1992 ("Today's [notice of proposed rulemaking] seeks public input on what, if any, revisions in light of SWANCC might be appropriate to the regulations that define 'waters of the U. S.', and today's [notice] thus would be of interest to *all*

*entities* discharging to, or regulating, *such waters*" (emphases added)). The agencies can decide for themselves whether, as the *SWANCC* dissenter suggests, it was wise for them to take no action in response to *SWANCC.*

# SUPREME COURT OF THE UNITED STATES

————

Nos. 04–1034 and 04–1384

————

JOHN A. RAPANOS, ET UX., ET AL., PETITIONERS
04–1034                    *v.*
UNITED STATES

JUNE CARABELL ET AL., PETITIONERS
04–1384                    *v.*
UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 19, 2006]

JUSTICE KENNEDY, concurring in the judgment.

These consolidated cases require the Court to decide whether the term "navigable waters" in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact. In *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159 (2001) *(SWANCC),* the Court held, under the circumstances presented there, that to constitute "'navigable waters'" under the Act, a water or wetland must possess a "significant nexus" to waters that are or were navigable in fact or that could reasonably be so made. *Id.*, at 167, 172. In the instant cases neither the plurality opinion nor the dissent by JUSTICE STEVENS chooses to apply this test; and though the Court of Appeals recognized the test's applicability, it did not consider all the factors necessary to determine whether the lands in

question had, or did not have, the requisite nexus. In my
view the cases ought to be remanded to the Court of Ap-
peals for proper consideration of the nexus requirement.

## I

Although both the plurality opinion and the dissent by
JUSTICE STEVENS (hereinafter the dissent) discuss the
background of these cases in some detail, a further discus-
sion of the relevant statutes, regulations, and facts may
clarify the analysis suggested here.

## A

The "objective" of the Clean Water Act (Act), is "to restore
and maintain the chemical, physical, and biological integ-
rity of the Nation's waters." 33 U. S. C. §1251(a). To that
end, the statute, among other things, prohibits "the dis-
charge of any pollutant by any person" except as provided
in the Act. §1311(a). As relevant here, the term "discharge
of a pollutant" means "any addition of any pollutant to
navigable waters from any point source." §1362(12). The
term "pollutant" is defined as "dredged spoil, solid waste,
incinerator residue, sewage, garbage, sewage sludge, muni-
tions, chemical wastes, biological materials, radioactive
materials, heat, wrecked or discarded equipment, rock,
sand, cellar dirt and industrial, municipal, and agricultural
waste discharged into water." §1362(6). The Secretary of
the Army, acting through the Chief of Engineers of the
Army Corps of Engineers, may issue permits for "discharge
of dredged or fill material into the navigable waters at
specified disposal sites." §§1344(a), (c), (d); but see §1344(f)
(categorically exempting certain forms of "discharge of
dredged or fill material" from regulation under §1311(a)).
Pursuant to §1344(g), States with qualifying programs may
assume certain aspects of the Corps' permitting responsibil-
ity. Apart from dredged or fill material, pollutant dis-
charges require a permit from the Environmental Protec-

tion Agency (EPA), which also oversees the Corps' (and qualifying States') permitting decisions. See §§1311(a), 1342(a), 1344(c). Discharge of pollutants without an appropriate permit may result in civil or criminal liability. See §1319.

The statutory term to be interpreted and applied in the two instant cases is the term "navigable waters." The outcome turns on whether that phrase reasonably describes certain Michigan wetlands the Corps seeks to regulate. Under the Act "[t]he term 'navigable waters' means the waters of the United States, including the territorial seas." §1362(7). In a regulation the Corps has construed the term "waters of the United States" to include not only waters susceptible to use in interstate commerce—the traditional understanding of the term "navigable waters of the United States," see, *e.g., United States* v. *Appalachian Elec. Power Co.,* 311 U. S. 377, 406–408 (1940); *The Daniel Ball,* 10 Wall. 557, 563–564 (1871)—but also tributaries of those waters and, of particular relevance here, wetlands adjacent to those waters or their tributaries. 33 CFR §§328.3(a)(1), (5), (7) (2005). The Corps views tributaries as within its jurisdiction if they carry a perceptible "ordinary high water mark." §328.4(c); 65 Fed. Reg. 12823 (2000). An ordinary high-water mark is a "line on the shore established by the fluctuations of water and indicated by physical characteristics such as clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas." 33 CFR §328.3(e).

Contrary to the plurality's description, *ante,* at 2–3, 15, wetlands are not simply moist patches of earth. They are defined as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do

support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." §328.3(b). The Corps' Wetlands Delineation Manual, including over 100 pages of technical guidance for Corps officers, interprets this definition of wetlands to require: (1) prevalence of plant species typically adapted to saturated soil conditions, determined in accordance with the United States Fish and Wildlife Service's National List of Plant Species that Occur in Wetlands; (2) hydric soil, meaning soil that is saturated, flooded, or ponded for sufficient time during the growing season to become anaerobic, or lacking in oxygen, in the upper part; and (3) wetland hydrology, a term generally requiring continuous inundation or saturation to the surface during at least five percent of the growing season in most years. See Wetlands Research Program Technical Report Y–87–1 (on-line edition), pp. 12–34 (Jan. 1987), http://www.saj.usace.army.mil/permit/documents/87manual.pdf (all Internet material as visited June 16, 2006, and available in Clerk of Court's case file). Under the Corps' regulations, wetlands are adjacent to tributaries, and thus covered by the Act, even if they are "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." §328.3(c).

## B

The first consolidated case before the Court, *Rapanos* v. *United States*, No. 04–1034, relates to a civil enforcement action initiated by the United States in the United States District Court for the Eastern District of Michigan against the owners of three land parcels near Midland, Michigan. The first parcel, known as the Salzburg site, consists of roughly 230 acres. The District Court, applying the Corps' definition of wetlands, found based on expert testimony that the Salzburg site included 28 acres of wetlands. The District Court further found that "the Salzburg wetlands

have a surface water connection to tributaries of the
Kawkawlin River which, in turn, flows into the Saginaw
River and ultimately into Lake Huron." App. to Pet. for
Cert. B11. Water from the site evidently spills into the
Hoppler Drain, located just north of the property, which
carries water into the Hoppler Creek and thence into the
Kawkawlin River, which is navigable. A state official
testified that he observed carp spawning in a ditch just
north of the property, indicating a direct surface-water
connection from the ditch to the Saginaw Bay of Lake
Huron.

The second parcel, known as the Hines Road site, con-
sists of 275 acres, which the District Court found included
64 acres of wetlands. The court found that the wetlands
have a surface-water connection to the Rose Drain, which
carries water into the Tittabawassee River, a navigable
waterway. The final parcel, called the Pine River site,
consists of some 200 acres. The District Court found that
49 acres were wetlands and that a surface water connec-
tion linked the wetlands to the nearby Pine River, which
flows into Lake Huron.

At all relevant times, John Rapanos owned the Salzburg
site; a company he controlled owned the Hines Road site;
and Rapanos' wife and a company she controlled (possibly
in connection with another entity) owned the Pine River
site. All these parties are petitioners here. In December
1988, Mr. Rapanos, hoping to construct a shopping center,
asked the Michigan Department of Natural Resources to
inspect the Salzburg site. A state official informed Ra-
panos that while the site likely included regulated wet-
lands, Rapanos could proceed with the project if the wet-
lands were delineated (that is, identified and preserved) or
if a permit were obtained. Pursuing the delineation op-
tion, Rapanos hired a wetlands consultant to survey the
property. The results evidently displeased Rapanos:
Informed that the site included between 48 and 58 acres of

wetlands, Rapanos allegedly threatened to "destroy" the consultant unless he eradicated all traces of his report. Rapanos then ordered $350,000-worth of earthmoving and landclearing work that filled in 22 of the 64 wetlands acres on the Salzburg site. He did so without a permit and despite receiving cease-and-desist orders from state officials and the EPA. At the Hines Road and Pine River sites, construction work—again conducted in violation of state and federal compliance orders—altered an additional 17 and 15 wetlands acres, respectively.

The Federal Government brought criminal charges against Rapanos. In the suit at issue here, however, the United States alleged civil violations of the Clean Water Act against all the *Rapanos* petitioners. Specifically, the Government claimed that petitioners discharged fill into jurisdictional wetlands, failed to respond to requests for information, and ignored administrative compliance orders. See 33 U. S. C. §§1311(a), 1318(a), 1319(a). After a 13-day bench trial, the District Court made the findings noted earlier and, on that basis, upheld the Corps' jurisdiction over wetlands on the three parcels. On the merits the court ruled in the Government's favor, finding that violations occurred at all three sites. As to two other sites, however, the court rejected the Corps' claim to jurisdiction, holding that the Government had failed to carry its burden of proving the existence of wetlands under the three-part regulatory definition. (These two parcels are no longer at issue.) The United States Court of Appeals for the Sixth Circuit affirmed. 376 F. 3d 629, 634 (2004). This Court granted certiorari to consider the Corps' jurisdiction over wetlands on the Salzburg, Hines Road, and Pine River sites. 546 U. S. ___ (2005).

The second consolidated case, *Carabell*, No. 04–1384, involves a parcel shaped like a right triangle and consisting of some 19.6 acres, 15.9 of which are forested wetlands. 257 F. Supp. 2d 917, 923 (ED Mich. 2003). The

property is located roughly one mile from Lake St. Clair, a 430-square-mile lake located between Michigan and Canada that is popular for boating and fishing and produces some 48 percent of the sport fish caught in the Great Lakes, see Brief for Macomb County, Michigan as *Amicus Curiae* 2. The right-angle corner of the property is located to the northwest. The hypotenuse, which runs from northeast to southwest, lies alongside a man-made berm that separates the property from a ditch. At least under current conditions—that is, without the deposit of fill in the wetlands that the landowners propose—the berm ordinarily, if not always, blocks surface-water flow from the wetlands into the ditch. But cf. App. 186a (administrative hearing testimony by consultant for Carabells indicating "you would start seeing some overflow" in a "ten year storm"). Near the northeast corner of the property, the ditch connects with the Sutherland-Oemig Drain, which carries water continuously throughout the year and empties into Auvase Creek. The creek in turn empties into Lake St. Clair. At its southwest end, the ditch connects to other ditches that empty into the Auvase Creek and thence into Lake St. Clair.

In 1993 petitioners Keith and June Carabell sought a permit from the Michigan Department of Environmental Quality (MDEQ), which has assumed permitting functions of the Corps pursuant to §1344(g). Petitioners hoped to fill in the wetlands and construct 130 condominium units. Although the MDEQ denied the permit, a State Administrative Law Judge directed the agency to approve an alternative plan, proposed by the Carabells, that involved the construction of 112 units. This proposal called for filling in 12.2 acres of the property while creating retention ponds on 3.74 acres. Because the EPA had objected to the permit, jurisdiction over the case transferred to the Corps. See §1344(j).

The Corps' district office concluded that the Carabells'

property "provides water storage functions that, if destroyed, could result in an increased risk of erosion and degradation of water quality in the Sutherland-Oemig Drain, Auvase Creek, and Lake St. Clair." *Id.,* at 127a. The district office denied the permit, and the Corps upheld the denial in an administrative appeal. The Carabells, challenging both the Corps' jurisdiction and the merits of the permit denial, sought judicial review pursuant to the Administrative Procedure Act, 5 U. S. C. §706(2)(A). The United States District Court for the Eastern District of Michigan granted summary judgment to the Corps, 257 F. Supp. 2d 917, and the United States Court of Appeals for the Sixth Circuit affirmed, 391 F. 3d 704 (2005). This Court granted certiorari to consider the jurisdictional question. 546 U. S. ___ (2005).

## II

Twice before the Court has construed the term "navigable waters" in the Clean Water Act. In *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121 (1985), the Court upheld the Corps' jurisdiction over wetlands adjacent to navigable-in-fact waterways. *Id.*, at 139. The property in *Riverside Bayview*, like the wetlands in the *Carabell* case now before the Court, was located roughly one mile from Lake St. Clair, see *United States* v. *Riverside Bayview Homes, Inc.*, 729 F. 2d 391, 392 (CA6 1984) (decision on review in *Riverside Bayview*), though in that case, unlike *Carabell*, the lands at issue formed part of a wetland that directly abutted a navigable-in-fact creek, 474 U. S., at 131. In regulatory provisions that remain in effect, the Corps had concluded that wetlands perform important functions such as filtering and purifying water draining into adjacent water bodies, 33 CFR §320.4(b)(2)(vii), slowing the flow of runoff into lakes, rivers, and streams so as to prevent flooding and erosion, §§320.4(b)(2)(iv), (v), and providing critical habitat for aquatic animal species, §320.4(b)(2)(i). 474

U. S., at 134–135. Recognizing that "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress," *id.*, at 131 (citing *Chemical Mfrs. Assn.* v. *Natural Resources Defense Council, Inc.,* 470 U. S. 116, 125 (1985), and *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–845 (1984)), the Court held that "the Corps' ecological judgment about the relationship between waters and their adjacent wetlands provides an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act," 474 U. S., at 134. The Court reserved, however, the question of the Corps' authority to regulate wetlands other than those adjacent to open waters. See *id.*, at 131–132, n. 8.

In *SWANCC*, the Court considered the validity of the Corps' jurisdiction over ponds and mudflats that were isolated in the sense of being unconnected to other waters covered by the Act. 531 U. S., at 171. The property at issue was an abandoned sand and gravel pit mining operation where "remnant excavation trenches" had "evolv[ed] into a scattering of permanent and seasonal ponds." *Id.*, at 163. Asserting jurisdiction pursuant to a regulation called the "Migratory Bird Rule," the Corps argued that these isolated ponds were "waters of the United States" (and thus "navigable waters" under the Act) because they were used as habitat by migratory birds. *Id.*, at 164–165. The Court rejected this theory. "It was the significant nexus between wetlands and 'navigable waters,'" the Court held, "that informed our reading of the [Act] in *Riverside Bayview Homes.*" *Id.*, at 167. Because such a nexus was lacking with respect to isolated ponds, the Court held that the plain text of the statute did not permit the Corps' action. *Id.*, at 172.

*Riverside Bayview* and *SWANCC* establish the framework for the inquiry in the cases now before the Court: Do

the Corps' regulations, as applied to the wetlands in *Carabell* and the three wetlands parcels in *Rapanos*, constitute a reasonable interpretation of "navigable waters" as in *Riverside Bayview* or an invalid construction as in *SWANCC?* Taken together these cases establish that in some instances, as exemplified by *Riverside Bayview*, the connection between a nonnavigable water or wetland and a navigable water may be so close, or potentially so close, that the Corps may deem the water or wetland a "navigable water" under the Act. In other instances, as exemplified by *SWANCC*, there may be little or no connection. Absent a significant nexus, jurisdiction under the Act is lacking. Because neither the plurality nor the dissent addresses the nexus requirement, this separate opinion, in my respectful view, is necessary.

A

The plurality's opinion begins from a correct premise. As the plurality points out, and as *Riverside Bayview* holds, in enacting the Clean Water Act Congress intended to regulate at least some waters that are not navigable in the traditional sense. *Ante*, at 12; *Riverside Bayview,* 474 U. S., at 133; see also *SWANCC*, *supra*, at 167. This conclusion is supported by "the evident breadth of congressional concern for protection of water quality and aquatic ecosystems." *Riverside Bayview*, *supra*, at 133; see also *Milwaukee* v. *Illinois,* 451 U. S. 304, 318 (1981) (describing the Act as "an all-encompassing program of water pollution regulation"). It is further compelled by statutory text, for the text is explicit in extending the coverage of the Act to some nonnavigable waters. In a provision allowing States to assume some regulatory functions of the Corps (an option Michigan has exercised), the Act limits States to issuing permits for:

> "the discharge of dredged or fill material into the navigable waters (other than those waters which are

presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their ordinary high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction." 33 U. S. C. §1344(g)(1).

Were there no Clean Water Act "navigable waters" apart from waters "presently used" or "susceptible to use" in interstate commerce, the "other than" clause, which begins the long parenthetical statement, would overtake the delegation of authority the provision makes at the outset. Congress, it follows, must have intended a broader meaning for navigable waters. The mention of wetlands in the "other than" clause, moreover, makes plain that at least some wetlands fall within the scope of the term "navigable waters." See *Riverside Bayview*, *supra*, at 138–139, and n. 11.

From this reasonable beginning the plurality proceeds to impose two limitations on the Act; but these limitations, it is here submitted, are without support in the language and purposes of the Act or in our cases interpreting it. First, because the dictionary defines "waters" to mean "water '[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,' or 'the flowing or moving masses, as of waves or floods, making up such streams or bodies," *ante*, at 13 (quoting Webster's New International Dictionary 2882 (2d ed. 1954) (hereinafter Webster's Second)), the plurality would conclude that the phrase "navigable waters" permits Corps and EPA jurisdiction only over "relatively permanent, standing or flowing bodies of water," *ante*, at 13–14—a category that in the plurality's view includes "seasonal" rivers, that is, rivers that carry water continuously except

during "dry months," but not intermittent or ephemeral streams, *ante*, at 13–15, and n. 5. Second, the plurality asserts that wetlands fall within the Act only if they bear "a continuous surface connection to bodies that are 'waters of the United States' in their own right"—waters, that is, that satisfy the plurality's requirement of permanent standing water or continuous flow. *Ante*, at 23–24.

The plurality's first requirement—permanent standing water or continuous flow, at least for a period of "some months," *ante*, at 13–14, and n. 5—makes little practical sense in a statute concerned with downstream water quality. The merest trickle, if continuous, would count as a "water" subject to federal regulation, while torrents thundering at irregular intervals through otherwise dry channels would not. Though the plurality seems to presume that such irregular flows are too insignificant to be of concern in a statute focused on "waters," that may not always be true. Areas in the western parts of the Nation provide some examples. The Los Angeles River, for instance, ordinarily carries only a trickle of water and often looks more like a dry roadway than a river. See, *e.g.,* B. Gumprecht, The Los Angeles River: Its Life, Death, and Possible Rebirth 1–2 (1999); Martinez, City of Angels' Signature River Tapped for Rebirth, Chicago Tribune, Apr. 10, 2005, section 1, p. 8. Yet it periodically releases water-volumes so powerful and destructive that it has been encased in concrete and steel over a length of some 50 miles. See Gumprecht, *supra*, at 227. Though this particular waterway might satisfy the plurality's test, it is illustrative of what often-dry watercourses can become when rain waters flow. See, *e.g.,* County of Los Angeles Dept. of Public Works, Water Resources Division: 2002–2003 Hydrologic Report, Runoff, Daily Discharge, F377–R BOUQUET CANYON CREEK at Urbandale Avenue 11107860 Bouquet Creek Near Saugus, CA, http://ladpw.org/wrd/report/0203/runoff/discharge.cfm

(indicating creek carried no flow for much of the year but carried 122 cubic feet per second on Feb. 12, 2003).

To be sure, Congress could draw a line to exclude irregular waterways, but nothing in the statute suggests it has done so. Quite the opposite, a full reading of the dictionary definition precludes the plurality's emphasis on permanence: The term "waters" may mean "flood or inundation," Webster's Second 2882, events that are impermanent by definition. Thus, although of course the Act's use of the adjective "navigable" indicates a focus on waterways rather than floods, Congress' use of "waters" instead of "water," *ante*, at 13, does not necessarily carry the connotation of "relatively permanent, standing or flowing bodies of water," *ante*, at 13–14. (And contrary to the plurality's suggestion, *ante*, at 13, n. 4, there is no indication in the dictionary that the "flood or inundation" definition is limited to poetry.) In any event, even granting the plurality's preferred definition—that "waters" means "water '[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,'" *ante*, at 13 (quoting Webster's Second 2882)—the dissent is correct to observe that an intermittent flow can constitute a stream, in the sense of " 'a current or course of water or other fluid, flowing on the earth,'" *ante*, at 14, n. 6 (quoting Webster's Second 2493), while it is flowing. See *post*, at 15–16 (STEVENS, J., dissenting) (also noting Court's use of the phrase "'intermittent stream'" in *Harrisonville* v. *W. S. Dickey Clay Mfg. Co.,* 289 U. S. 334, 335 (1933)). It follows that the Corps can reasonably interpret the Act to cover the paths of such impermanent streams.

Apart from the dictionary, the plurality invokes *Riverside Bayview* to support its interpretation that the term "waters" is so confined, but this reliance is misplaced. To be sure, the Court there compared wetlands to "rivers, streams, and other hydrographic features more conventionally identifiable as 'waters.'" 474 U. S., at 131. It is

quite a stretch to claim, however, that this mention of hydrographic features "echoe[s]" the dictionary's reference to "*'geographical features* such as oceans, rivers, [and] lakes.'" *Ante*, at 16 (quoting Webster's Second 2882). In fact the *Riverside Bayview* opinion does not cite the dictionary definition on which the plurality relies, and the phrase "hydrographic features" could just as well refer to intermittent streams carrying substantial flow to navigable waters. See Webster's Second 1221 (defining "hydrography" as "[t]he description and study of seas, lakes, rivers, and other waters; specif[ically] . . . [t]he measurement of flow and investigation of the behavior of streams, esp[ecially] with reference to the control or utilization of their waters").

Also incorrect is the plurality's attempt to draw support from the statutory definition of "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U. S. C. §1362(14). This definition is central to the Act's regulatory structure, for the term "discharge of a pollutant" is defined in relevant part to mean "any addition of any pollutant to navigable waters from any point source," §1362(12). Interpreting the point-source definition, the plurality presumes, first, that the point-source examples describe "watercourses through which *intermittent* waters typically flow," and second, that point sources and navigable waters are "separate and distinct categories." *Ante*, at 17. From this the plurality concludes, by a sort of negative inference, that navigable waters may not be intermittent. The conclusion is unsound. Nothing in the point-source definition requires an intermittent flow. Polluted water could flow night and day from a pipe, channel, or conduit and yet still qualify as a point source; any con-

trary conclusion would likely exclude, among other things, effluent streams from sewage treatment plants. As a result, even were the statute read to require continuity of flow for navigable waters, certain water-bodies could conceivably constitute both a point source and a water. At any rate, as the dissent observes, the fact that point sources may carry continuous flow undermines the plurality's conclusion that covered "waters" under the Act may not be discontinuous. See *post*, at 17.

The plurality's second limitation—exclusion of wetlands lacking a continuous surface connection to other jurisdictional waters—is also unpersuasive. To begin with, the plurality is wrong to suggest that wetlands are "*indistinguishable*" from waters to which they bear a surface connection. *Ante*, at 37. Even if the precise boundary may be imprecise, a bog or swamp is different from a river. The question is what circumstances permit a bog, swamp, or other nonnavigable wetland to constitute a "navigable water" under the Act—as §1344(g)(1), if nothing else, indicates is sometimes possible, see *supra*, at 10–11. *Riverside Bayview* addressed that question and its answer is inconsistent with the plurality's theory. There, in upholding the Corps' authority to regulate "wetlands adjacent to other bodies of water over which the Corps has jurisdiction," the Court deemed it irrelevant whether "the moisture creating the wetlands . . . find[s] its source in the adjacent bodies of water." 474 U. S., at 135. The Court further observed that adjacency could serve as a valid basis for regulation even as to "wetlands that are not significantly intertwined with the ecosystem of adjacent waterways." *Id.*, at 135, n. 9. "If it is reasonable," the Court explained, "for the Corps to conclude that in the majority of cases, adjacent wetlands have significant effects on water quality and the aquatic ecosystem, its definition can stand." *Ibid.*

The Court in *Riverside Bayview* did note, it is true, the

difficulty of defining where "water ends and land begins," *id.,* at 132, and the Court cited that problem as one reason for deferring to the Corps' view that adjacent wetlands could constitute waters. Given, however, the further recognition in *Riverside Bayview* that an overinclusive definition is permissible even when it reaches wetlands holding moisture disconnected from adjacent water-bodies, *id.,* at 135, and n. 9, *Riverside Bayview*'s observations about the difficulty of defining the water's edge cannot be taken to establish that when a clear boundary is evident, wetlands beyond the boundary fall outside the Corps' jurisdiction.

For the same reason *Riverside Bayview* also cannot be read as rejecting only the proposition, accepted by the Court of Appeals in that case, that wetlands covered by the Act must contain moisture originating in neighboring waterways. See *id.,* at 125, 134. Since the Court of Appeals had accepted that theory, the Court naturally addressed it. Yet to view the decision's reasoning as limited to that issue—an interpretation the plurality urges here, *ante*, at 33, n. 13—would again overlook the opinion's broader focus on wetlands' "significant effects on water quality and the aquatic ecosystem," 474 U. S., at 135, n. 9. In any event, even were this reading of *Riverside Bayview* correct, it would offer no support for the plurality's proposed requirement of a "continuous surface connection," *ante*, at 23. The Court in *Riverside Bayview* rejected the proposition that origination in flooding was necessary for jurisdiction over wetlands. It did not suggest that a flood-based origin would not support jurisdiction; indeed, it presumed the opposite. See 474 U. S., at 134 (noting that the Corps' view was valid "*even* for wetlands that are not the result of flooding or permeation" (emphasis added)). Needless to say, a continuous connection is not necessary for moisture in wetlands to result from flooding—the connection might well exist only during floods.

*SWANCC*, likewise, does not support the plurality's surface-connection requirement. *SWANCC*'s holding that "nonnavigable, isolated, intrastate waters," 531 U. S., at 171, are not "navigable waters" is not an explicit or implicit overruling of *Riverside Bayview*'s approval of adjacency as a factor in determining the Corps' jurisdiction. In rejecting the Corps' claimed authority over the isolated ponds in *SWANCC*, the Court distinguished adjacent nonnavigable waters such as the wetlands addressed in *Riverside Bayview*. 531 U. S., at 167, 170–171.

As *Riverside Bayview* recognizes, the Corps' adjacency standard is reasonable in some of its applications. Indeed, the Corps' view draws support from the structure of the Act, while the plurality's surface-water-connection requirement does not.

As discussed above, the Act's prohibition on the discharge of pollutants into navigable waters, 33 U. S. C. §1311(a), covers both the discharge of toxic materials such as sewage, chemical waste, biological material, and radioactive material and the discharge of dredged spoil, rock, sand, cellar dirt, and the like. All these substances are defined as pollutants whose discharge into navigable waters violates the Act. §§1311(a), 1362(6), (12). One reason for the parallel treatment may be that the discharge of fill material can impair downstream water quality. The plurality argues otherwise, asserting that dredged or fill material "does not normally wash downstream." *Ante*, at 26. As the dissent points out, this proposition seems questionable as an empirical matter. See *post*, at 22. It seems plausible that new or loose fill, not anchored by grass or roots from other vegetation, could travel downstream through waterways adjacent to a wetland; at the least this is a factual possibility that the Corps' experts can better assess than can the plurality. Silt, whether from natural or human sources, is a major factor in aquatic environments, and it may clog water-

ways, alter ecosystems, and limit the useful life of dams. See, *e.g.,* Fountain, Unloved, But Not Unbuilt, N. Y. Times, June 5, 2005 section 4, p. 3, col. 1; DePalma, Dam to Be Demolished to Save an Endangered Species, N. Y. Times, Apr. 26, 2004, section B, p. 1, col. 2; MacDougall, Damage Can Be Irreversible, Los Angeles Times, June 19, 1987, pt. 1, p. 10, col. 4.

Even granting, however, the plurality's assumption that fill material will stay put, Congress' parallel treatment of fill material and toxic pollution may serve another purpose. As the Court noted in *Riverside Bayview*, "the Corps has concluded that wetlands may serve to filter and purify water draining into adjacent bodies of water, 33 CFR §320.4(b)(2)(vii) (1985), and to slow the flow of surface runoff into lakes, rivers, and streams and thus prevent flooding and erosion, see §§320.4(b)(2)(iv) and (v)." 474 U. S., at 134. Where wetlands perform these filtering and runoff-control functions, filling them may increase downstream pollution, much as a discharge of toxic pollutants would. Not only will dirty water no longer be stored and filtered but also the act of filling and draining itself may cause the release of nutrients, toxins, and pathogens that were trapped, neutralized, and perhaps amenable to filtering or detoxification in the wetlands. See U. S. Congress, Office of Technology Assessment, Wetlands: Their Use and Regulation, OTA–O–206 pp. 43, 48–52 (Mar. 1984), http://govinfo.library.unt.edu/ota/OTA_4/DATA/1984/8433 .pdf (hereinafter OTA). In many cases, moreover, filling in wetlands separated from another water by a berm can mean that flood water, impurities, or runoff that would have been stored or contained in the wetlands will instead flow out to major waterways. With these concerns in mind, the Corps' definition of adjacency is a reasonable one, for it may be the absence of an interchange of waters prior to the dredge and fill activity that makes protection of the wetlands critical to the statutory scheme.

In sum the plurality's opinion is inconsistent with the Act's text, structure, and purpose. As a fallback the plurality suggests that avoidance canons would compel its reading even if the text were unclear. *Ante*, at 18–20. In *SWANCC*, as one reason for rejecting the Corps' assertion of jurisdiction over the isolated ponds at issue there, the Court observed that this "application of [the Corps'] regulations" would raise significant questions of Commerce Clause authority and encroach on traditional state land-use regulation. 531 U. S., at 174. As *SWANCC* observed, *ibid.*, and as the plurality points out here, *ante*, at 18, the Act states that "[i]t is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, [and] to plan the development and use . . . of land and water resources," 33 U. S. C. §1251(b). The Court in *SWANCC* cited this provision as evidence that a clear statement supporting jurisdiction in applications raising constitutional and federalism difficulties was lacking. 531 U. S., at 174.

The concerns addressed in *SWANCC* do not support the plurality's interpretation of the Act. In *SWANCC*, by interpreting the Act to require a significant nexus with navigable waters, the Court avoided applications—those involving waters without a significant nexus—that appeared likely, as a category, to raise constitutional difficulties and federalism concerns. Here, in contrast, the plurality's interpretation does not fit the avoidance concerns it raises. On the one hand, when a surface-water connection is lacking, the plurality forecloses jurisdiction over wetlands that abut navigable-in-fact waters—even though such navigable waters were traditionally subject to federal authority. On the other hand, by saying the Act covers wetlands (however remote) possessing a surface-water connection with a continuously flowing stream (however small), the plurality's reading would permit applications of the statute as far from traditional federal authority as are

the waters it deems beyond the statute's reach.  Even assuming, then, that federal regulation of remote wetlands and nonnavigable waterways would raise a difficult Comerce Clause issue notwithstanding those waters' aggregate effects on national water quality, but cf. *Wickard* v. *Filburn,* 317 U. S. 111 (1942); see also *infra*, at 25–26, the plurality's reading is not responsive to this concern.   As for States' "responsibilities and rights," §1251(b), it is noteworthy that 33 States plus the District of Columbia have filed an *amici* brief in this litigation asserting that the Clean Water Act is important to their own water policies.  See Brief for States of New York et al. 1–3. These *amici* note, among other things, that the Act protects downstream States from out-of-state pollution that they cannot themselves regulate.  *Ibid.*

It bears mention also that the plurality's overall tone and approach—from the characterization of acres of wetlands destruction as "backfilling . . . wet fields," *ante*, at 2, to the rejection of Corps authority over "man-made drainage ditches" and "dry arroyos" without regard to how much water they periodically carry, *ante*, at 15, to the suggestion, seemingly contrary to Congress' judgment, that discharge of fill material is inconsequential for adjacent waterways, *ante*, at 26, and n. 11—seems unduly dismissive of the interests asserted by the United States in these cases.  Important public interests are served by the Clean Water Act in general and by the protection of wetlands in particular.  To give just one example, *amici* here have noted that nutrient-rich runoff from the Mississippi River has created a hypoxic, or oxygen-depleted, "dead zone" in the Gulf of Mexico that at times approaches the size of Massachusetts and New Jersey.  Brief for Association of State Wetland Managers et al. 21–23; Brief for Environmental Law Institute 23.   Scientific evidence indicates that wetlands play a critical role in controlling and filtering runoff.  See, *e.g.,* OTA 43, 48–52; R. Tiner, In

Search of Swampland: A Wetland Sourcebook and Field
Guide 93–95 (2d ed. 2005); Whitmire & Hamilton, Rapid
Removal of Nitrate and Sulfate in Freshwater Wetland
Sediments, 34 J. Env. Quality 2062 (2005). It is true, as
the plurality indicates, that environmental concerns pro-
vide no reason to disregard limits in the statutory text,
*ante*, at 27, but in my view the plurality's opinion is not a
correct reading of the text. The limits the plurality would
impose, moreover, give insufficient deference to Congress'
purposes in enacting the Clean Water Act and to the
authority of the Executive to implement that statutory
mandate.

Finally, it should go without saying that because the
plurality presents its interpretation of the Act as the only
permissible reading of the plain text, *ante*, at 20, 23–24,
the Corps would lack discretion, under the plurality's
theory, to adopt contrary regulations. THE CHIEF JUSTICE
suggests that if the Corps and EPA had issued new regu-
lations after *SWANCC* they would have "enjoyed plenty of
room to operate in developing *some* notion of an outer
bound to the reach of their authority" and thus could have
avoided litigation of the issues we address today. *Ante*, at
2. That would not necessarily be true under the opinion
THE CHIEF JUSTICE has joined. New rulemaking could
have averted the disagreement here only if the Corps had
anticipated the unprecedented reading of the Act that the
plurality advances.

B

While the plurality reads nonexistent requirements into
the Act, the dissent reads a central requirement out—
namely, the requirement that the word "navigable" in
"navigable waters" be given some importance. Although
the Court has held that the statute's language invokes
Congress' traditional authority over waters navigable in
fact or susceptible of being made so, *SWANCC*, 531 U. S.,

at 172 (citing *Appalachian Power*, 311 U. S., at 407–408), the dissent would permit federal regulation whenever wetlands lie alongside a ditch or drain, however remote and insubstantial, that eventually may flow into traditional navigable waters. The deference owed to the Corps' interpretation of the statute does not extend so far.

Congress' choice of words creates difficulties, for the Act contemplates regulation of certain "navigable waters" that are not in fact navigable. *Supra*, at 10–11. Nevertheless, the word "navigable" in the Act must be given some effect. See *SWANCC*, *supra*, at 172. Thus, in *SWANCC* the Court rejected the Corps' assertion of jurisdiction over isolated ponds and mudflats bearing no evident connection to navigable-in-fact waters. And in *Riverside Bayview*, while the Court indicated that "the term 'navigable' as used in the Act is of limited import," 474 U. S., at 133, it relied, in upholding jurisdiction, on the Corps' judgment that "wetlands adjacent to lakes, rivers, streams, and other bodies of water may function as integral parts of the aquatic environment even when the moisture creating the wetlands does not find its source in the adjacent bodies of water," *id.,* at 135. The implication, of course, was that wetlands' status as "integral parts of the aquatic environment"—that is, their significant nexus with navigable waters—was what established the Corps' jurisdiction over them as waters of the United States.

Consistent with *SWANCC* and *Riverside Bayview* and with the need to give the term "navigable" some meaning, the Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense. The required nexus must be assessed in terms of the statute's goals and purposes. Congress enacted the law to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U. S. C. §1251(a), and it pursued that objective by restricting dumping and

filling in "navigable waters," §§1311(a), 1362(12). With respect to wetlands, the rationale for Clean Water Act regulation is, as the Corps has recognized, that wetlands can perform critical functions related to the integrity of other waters—functions such as pollutant trapping, flood control, and runoff storage. 33 CFR §320.4(b)(2). Accordingly, wetlands possess the requisite nexus, and thus come within the statutory phrase "navigable waters," if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as "navigable." When, in contrast, wetlands' effects on water quality are speculative or insubstantial, they fall outside the zone fairly encompassed by the statutory term "navigable waters."

Although the dissent acknowledges that wetlands' ecological functions vis-à-vis other covered waters are the basis for the Corps' regulation of them, *post*, at 10–11, it concludes that the ambiguity in the phrase "navigable waters" allows the Corps to construe the statute as reaching all "non-isolated wetlands," just as it construed the Act to reach the wetlands adjacent to navigable-in-fact waters in *Riverside Bayview*, see *post*, at 11. This, though, seems incorrect. The Corps' theory of jurisdiction in these consolidated cases—adjacency to tributaries, however remote and insubstantial—raises concerns that go beyond the holding of *Riverside Bayview;* and so the Corps' assertion of jurisdiction cannot rest on that case.

As applied to wetlands adjacent to navigable-in-fact waters, the Corps' conclusive standard for jurisdiction rests upon a reasonable inference of ecologic interconnection, and the assertion of jurisdiction for those wetlands is sustainable under the Act by showing adjacency alone. That is the holding of *Riverside Bayview*. Furthermore, although the *Riverside Bayview* Court reserved the question of the Corps' authority over "wetlands that are not

adjacent to bodies of open water," 474 U. S., at 131–132, n. 8, and in any event addressed no factual situation other than wetlands adjacent to navigable-in-fact waters, it may well be the case that *Riverside Bayview*'s reasoning— supporting jurisdiction without any inquiry beyond adjacency—could apply equally to wetlands adjacent to certain major tributaries. Through regulations or adjudication, the Corps may choose to identify categories of tributaries that, due to their volume of flow (either annually or on average), their proximity to navigable waters, or other relevant considerations, are significant enough that wetlands adjacent to them are likely, in the majority of cases, to perform important functions for an aquatic system incorporating navigable waters.

The Corps' existing standard for tributaries, however, provides no such assurance. As noted earlier, the Corps deems a water a tributary if it feeds into a traditional navigable water (or a tributary thereof) and possesses an ordinary high-water mark, defined as a "line on the shore established by the fluctuations of water and indicated by [certain] physical characteristics," §328.3(e). See *supra*, at 3. This standard presumably provides a rough measure of the volume and regularity of flow. Assuming it is subject to reasonably consistent application, but see U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO–04–297 pp. 3–4 (Feb. 2004), http://www.gao.gov/new.items/d04297.pdf (noting variation in results among Corps district offices), it may well provide a reasonable measure of whether specific minor tributaries bear a sufficient nexus with other regulated waters to constitute "navigable waters" under the Act. Yet the breadth of this standard—which seems to

leave wide room for regulation of drains, ditches, and streams remote from any navigable-in-fact water and carrying only minor water-volumes towards it—precludes its adoption as the determinative measure of whether adjacent wetlands are likely to play an important role in the integrity of an aquatic system comprising navigable waters as traditionally understood. Indeed, in many cases wetlands adjacent to tributaries covered by this standard might appear little more related to navigable-in-fact waters than were the isolated ponds held to fall beyond the Act's scope in *SWANCC*. Cf. Leibowitz & Nadeau, Isolated Wetlands: State-of-the-Science and Future Directions, 23 Wetlands 663, 669 (2003) (noting that "'isolated' is generally a matter of degree").

When the Corps seeks to regulate wetlands adjacent to navigable-in-fact waters, it may rely on adjacency to establish its jurisdiction. Absent more specific regulations, however, the Corps must establish a significant nexus on a case-by-case basis when it seeks to regulate wetlands based on adjacency to nonnavigable tributaries. Given the potential overbreadth of the Corps' regulations, this showing is necessary to avoid unreasonable applications of the statute. Where an adequate nexus is established for a particular wetland, it may be permissible, as a matter of administrative convenience or necessity, to presume covered status for other comparable wetlands in the region. That issue, however, is neither raised by these facts nor addressed by any agency regulation that accommodates the nexus requirement outlined here.

This interpretation of the Act does not raise federalism or Commerce Clause concerns sufficient to support a presumption against its adoption. To be sure, the significant nexus requirement may not align perfectly with the traditional extent of federal authority. Yet in most cases regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters will

raise no serious constitutional or federalism difficulty. Cf. *Pierce County* v. *Guillen,* 537 U. S. 129, 147 (2003) (upholding federal legislation "aimed at improving safety in the channels of commerce"); *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.,* 313 U. S. 508, 524–525 (1941) ("[J]ust as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries . . . . [T]he exercise of the granted power of Congress to regulate interstate commerce may be aided by appropriate and needful control of activities and agencies which, though intrastate, affect that commerce"). As explained earlier, moreover, and as exemplified by *SWANCC*, the significant-nexus test itself prevents problematic applications of the statute. See *supra*, at 19–20; 531 U. S., at 174. The possibility of legitimate Commerce Clause and federalism concerns in some circumstances does not require the adoption of an interpretation that departs in all cases from the Act's text and structure. See *Gonzales* v. *Raich*, 545 U. S. 1, __ (2005) (slip op., at 14) ("[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence" (internal quotation marks omitted)).

## III

In both the consolidated cases before the Court the record contains evidence suggesting the possible existence of a significant nexus according to the principles outlined above. Thus the end result in these cases and many others to be considered by the Corps may be the same as that suggested by the dissent, namely, that the Corps' assertion of jurisdiction is valid. Given, however, that neither the agency nor the reviewing courts properly considered the issue, a remand is appropriate, in my view, for appli-

cation of the controlling legal standard.

## *Rapanos*

As the dissent points out, in *Rapanos*, No. 04–1034, an expert whom the District Court found "eminently qualified" and "highly credible," App. to Pet. for Cert. B7, testified that the wetlands were providing "habitat, sediment trapping, nutrient recycling, and flood peak diminution, reduction flow water augmentation." 4 Tr. 96 (Apr. 5, 1999). Although the expert had "not studied the upstream drainage of these sites" and thus could not assert that the wetlands were performing important pollutant-trapping functions, *ibid.,* he did observe:

> "we have a situation in which the flood water attenuation in that water is held on the site in the wetland . . . such that it does not add to flood peak. By the same token it would have some additional water flowing into the rivers during the drier periods, thus, increasing the low water flow. . . . By the same token on all of the sites to the extent that they slow the flow of water off of the site they will also accumulate sediment and thus trap sediment and hold nutrients for use in those wetlands systems later in the season as well." *Id.*, at 95–96.

In addition, in assessing the hydrology prong of the three-part wetlands test, see *supra*, at 3–4, the District Court made extensive findings regarding water tables and drainage on the parcels at issue. In applying the Corps' jurisdictional regulations, the District Court found that each of the wetlands bore surface water connections to tributaries of navigable-in-fact waters.

Much the same evidence should permit the establishment of a significant nexus with navigable-in-fact waters, particularly if supplemented by further evidence about the significance of the tributaries to which the wetlands are

connected. The Court of Appeals, however, though recognizing that under *SWANCC* such a nexus was required for jurisdiction, held that a significant nexus "can be satisfied by the presence of a hydrologic connection." 376 F. 3d, at 639. Absent some measure of the significance of the connection for downstream water quality, this standard was too uncertain. Under the analysis described earlier, *supra*, at 22–23, 25, mere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood. In my view this case should be remanded so that the District Court may reconsider the evidence in light of the appropriate standard. See, *e.g., Pullman-Standard* v. *Swint,* 456 U. S. 273, 291 (1982) ("When an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings").

### *Carabell*

In *Carabell*, No. 04–1384, the record also contains evidence bearing on the jurisdictional inquiry. The Corps noted in deciding the administrative appeal that "[b]esides the effects on wildlife habitat and water quality, the [district office] also noted that the project would have a major, long-term detrimental effect on wetlands, flood retention, recreation and conservation and overall ecology," App. 218a. Similarly, in the district office's permit evaluation, Corps officers observed:

> "The proposed work would destroy/adversely impact an area that retains rainfall and forest nutrients and would replace it with a new source area for runoff pollutants. Pollutants from this area may include lawn fertilizers, herbicides, pesticides, road salt, oil, and grease. These pollutants would then runoff directly

> into the waterway. . . . Overall, the operation and use
> of the proposed activity would have a major, long
> term, negative impact on water quality. The cumula-
> tive impacts of numerous such projects would be ma-
> jor and negative as the few remaining wetlands in the
> area are developed." *Id.*, at 97a–98a.

The Corps' evaluation further noted that by "eliminat[ing]
the potential ability of the wetland to act as a sediment
catch basin," the proposed project "would contribute to
increased runoff and accretion . . . along the drain and
further downstream in Auvase Creek." *Id.*, at 98a. And it
observed that increased runoff from the site would likely
cause downstream areas to "see an increase in possible
flooding magnitude and frequency." *Id.*, at 99a.

The conditional language in these assessments—"potential
ability," "possible flooding"—could suggest an undue degree
of speculation, and a reviewing court must identify sub-
stantial evidence supporting the Corps' claims, see 5
U. S. C. §706(2)(E). Nevertheless, the record does show
that factors relevant to the jurisdictional inquiry have
already been noted and considered. As in *Rapanos*,
though, the record gives little indication of the quantity
and regularity of flow in the adjacent tributaries—a con-
sideration that may be important in assessing the nexus.
Also, as in *Rapanos*, the legal standard applied to the facts
was imprecise.

The Court of Appeals, considering the *Carabell* case
after its *Rapanos* decision, framed the inquiry in terms of
whether hydrologic connection is required to establish a
significant nexus. The court held that it is not, and that
much of its holding is correct. Given the role wetlands
play in pollutant filtering, flood control, and runoff stor-
age, it may well be the absence of hydrologic connection (in
the sense of interchange of waters) that shows the wet-
lands' significance for the aquatic system. In the adminis-

trative decision under review, however, the Corps based its jurisdiction solely on the wetlands' adjacency to the ditch opposite the berm on the property's edge. As explained earlier, mere adjacency to a tributary of this sort is insufficient; a similar ditch could just as well be located many miles from any navigable-in-fact water and carry only insubstantial flow towards it. A more specific inquiry, based on the significant nexus standard, is therefore necessary. Thus, a remand is again required to permit application of the appropriate legal standard. See, *e.g., INS* v. *Orlando Ventura,* 537 U. S. 12, 16 (2002) *(per curiam)* ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands").

*   *   *

In these consolidated cases I would vacate the judgments of the Court of Appeals and remand for consideration whether the specific wetlands at issue possess a significant nexus with navigable waters.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 04–1034 and 04–1384

_____

JOHN A. RAPANOS, ET UX., ET AL., PETITIONERS
04–1034                         *v.*
UNITED STATES


JUNE CARABELL ET AL., PETITIONERS
04–1384                         *v.*
UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 19, 2006]

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In 1972, Congress decided to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by passing what we now call the Clean Water Act. 86 Stat. 816, as amended, 33 U. S. C. §1251 *et seq.* The costs of achieving the Herculean goal of ending water pollution by 1985, see §1251(a), persuaded President Nixon to veto its enactment, but both Houses of Congress voted to override that veto by overwhelming margins. To achieve its goal, Congress prohibited "the discharge of any pollutant"—defined to include "any addition of any pollutant to navigable waters from any point source"—without a permit issued by the Army Corps of Engineers (Army Corps or Corps) or the Environmental Protection Agency (EPA). §§1311(a), 1362(12)(A). Congress further defined "navigable waters" to mean "the waters of the United States." §1362(7).

The narrow question presented in No. 04–1034 is

whether wetlands adjacent to tributaries of traditionally navigable waters are "waters of the United States" subject to the jurisdiction of the Army Corps; the question in No. 04–1384 is whether a manmade berm separating a wetland from the adjacent tributary makes a difference. The broader question is whether regulations that have protected the quality of our waters for decades, that were implicitly approved by Congress, and that have been repeatedly enforced in case after case, must now be revised in light of the creative criticisms voiced by the plurality and JUSTICE KENNEDY today. Rejecting more than 30 years of practice by the Army Corps, the plurality disregards the nature of the congressional delegation to the agency and the technical and complex character of the issues at stake. JUSTICE KENNEDY similarly fails to defer sufficiently to the Corps, though his approach is far more faithful to our precedents and to principles of statutory interpretation than is the plurality's.

In my view, the proper analysis is straightforward. The Army Corps has determined that wetlands adjacent to tributaries of traditionally navigable waters preserve the quality of our Nation's waters by, among other things, providing habitat for aquatic animals, keeping excessive sediment and toxic pollutants out of adjacent waters, and reducing downstream flooding by absorbing water at times of high flow. The Corps' resulting decision to treat these wetlands as encompassed within the term "waters of the United States" is a quintessential example of the Executive's reasonable interpretation of a statutory provision. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842–845 (1984).

Our unanimous decision in *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121 (1985), was faithful to our duty to respect the work product of the Legislative and Executive Branches of our Government. Today's judicial amendment of the Clean Water Act is not.

I

At each of the three sites at issue in No. 04–1034, the petitioners filled large areas of wetlands without permits, despite being on full notice of the Corps' regulatory requirements. Because the plurality gives short shrift to the facts of this case—as well as to those of No. 04–1384—I shall discuss them at some length.

The facts related to the 230-acre Salzburg site are illustrative. In 1988, John Rapanos asked the Michigan Department of Natural Resources (MDNR) to inspect the site "in order to discuss with him the feasibility of building a shopping center there." App. to Pet. for Cert. in No. 04–1034, p. B15. An MDNR inspector informed Rapanos that the land probably included wetlands that were "waters of the United States" and sent him an application for a permit under §404 of the Act.[1] Rapanos then hired a wetland consultant, Dr. Frederick Goff. After Dr. Goff concluded that the land did in fact contain many acres of wetlands, "Rapanos threatened to 'destroy' Dr. Goff if he did not destroy the wetland report, and refused to pay Dr. Goff unless and until he complied." *Ibid.* In the meantime, without applying for a permit, Rapanos hired construction companies to do $350,000 worth of work clearing the land, filling in low spots, and draining subsurface water. After Rapanos prevented MDNR inspectors from visiting the site, ignored an MDNR cease-and-desist letter, and refused to obey an administrative compliance order issued by the EPA, the matter was referred to the Department of Justice. In the civil case now before us, the District Court found that Rapanos unlawfully filled 22 acres of wetlands.

Rapanos and his wife engaged in similar behavior at the Hines Road and Pine River sites. Without applying for §404 permits, they hired construction companies to per-

––––––––

[1] Pursuant to 33 U. S. C. §§1344(g)–(h), Michigan operates its own §404 permitting program, subject to supervision from the Army Corps.

form extensive clearing and filling activities. They continued these activities even after receiving EPA administrative compliance orders directing them to cease the work immediately. They ultimately spent $158,000 at the 275-acre Hines Road site, filling 17 of its existing 64 acres of wetlands. At the 200-acre Pine River site, they spent $463,000 and filled 15 of its 49 acres of wetlands.

Prior to their destruction, the wetlands at all three sites had surface connections to tributaries of traditionally navigable waters. The Salzburg wetlands connected to a drain that flows into a creek that flows into the navigable Kawkawlin River. The Hines Road wetlands connected to a drain that flows into the navigable Tittabawassee River. And the Pine River wetlands connected with the Pine River, which flows into Lake Huron.

At trial, the Government put on a wetland expert, Dr. Daniel Willard, whom the trial court found "eminently qualified" and "highly credible." *Id.,* at B7. Dr. Willard testified that the wetlands at these three sites provided ecological functions in terms of "habitat, sediment trapping, nutrient recycling, and flood peak diminution." 4 Tr. 96 (Apr. 5, 1999).[2] He explained:

> "[G]enerally for all of the . . . sites we have a situation in which the flood water attenuation in that water is held on the site in the wetland . . . such that it does not add to flood peak. By the same token it would have some additional water flowing into the rivers during the drier periods, thus, increasing low water flow.
>
> .          .          .          .          .
>
>  "By the same token on all of the sites to the extent

––––––––––

[2] Dr. Willard did not "stud[y] the upstream drainage of these sites . . . well enough to make a statement" about whether they also performed pollutant-trapping functions. 4 Tr. 96.

that they slow the flow of water of the site they will also accumulate sediment and thus trap sediment and hold nutrients for use in those wetland systems later in the season as well." *Id.,* at 95–96.

The District Court found that the wetlands at all three sites were covered by the Clean Water Act and that the Rapanoses had violated the Act by destroying them without permits. The Sixth Circuit unanimously affirmed. 376 F. 3d 629 (2004).

The facts of No. 04–1384 are less dramatic. The petitioners in that case own a 20-acre tract of land, of which 16 acres are wetlands, located in Macomb County a mile from Lake St. Clair. These wetlands border a ditch that flows into a drain that flows into a creek that flows into Lake St. Clair. A 4-foot-wide manmade berm separates the wetlands from the ditch; thus water rarely if ever passes from wetlands to ditch or vice versa.

Petitioners applied for a permit to fill most of these wetlands with 57,500 cubic yards of material. They intended to build a 112-unit condominium development on the site. After inspecting the site and considering comments from, among others, the Water Quality Unit of the Macomb County Prosecutor's Office (which urged the Corps to deny the permit because "[t]he loss of this high quality wetland area would have an unacceptable adverse effect on wildlife, water quality, and conservation of wetlands resources," App. in No. 04–1384, p. 79a), the Corps denied the permit. *Id.,* at 84a–126a. As summarized in a letter sent to petitioners, reasons for denial included:

"Your parcel is primarily a forested wetland that provides valuable seasonal habitat for aquatic organisms and year round habitat for terrestrial organisms. Additionally, the site provides water storage functions that, if destroyed, could result in an increased risk of erosion and degradation of water quality in the Suth-

erland-Oemig Drain, Auvase Creek, and Lake St. Clair. The minimization of impacts to these wetlands is important for conservation and the overall ecology of the region. Because the project development area is a forested wetland, the proposed project would destroy the resources in such a manner that they would not soon recover from impacts of the discharges. The extent of impacts in the project area when considered both individually and cumulatively would be unacceptable and contrary to the public interest." *Id.,* at 127a–128a.

As in No. 04–1034, the unanimous judgment of the District and Circuit Judges was that the Corps has jurisdiction over this wetland because it is adjacent to a tributary of traditionally navigable waters. 391 F. 3d 704 (CA6 2004). The Solicitor General defends both judgments.

## II

Our unanimous opinion in *Riverside Bayview* squarely controls these cases. There, we evaluated the validity of the very same regulations at issue today. These regulations interpret "waters of the United States" to cover all traditionally navigable waters; tributaries of these waters; and wetlands adjacent to traditionally navigable waters or their tributaries. 33 CFR §§328.3(a)(1), (5), and (7) (2005); §§323.2(a)(1), (5), and (7) (1985). Although the particular wetland at issue in *Riverside Bayview* abutted a navigable creek, we framed the question presented as whether the Clean Water Act "authorizes the Corps to require landowners to obtain permits from the Corps before discharging fill material into wetlands adjacent to navigable bodies of water *and their tributaries.*" 474 U. S., at 123 (emphasis added).[3]

———————
[3] By contrast, we "d[id] not express any opinion" on the Corps' additional assertion of jurisdiction over "wetlands that are not adjacent to

We held that, pursuant to our decision in *Chevron*,

> "our review is limited to the question whether it is
> reasonable, in light of the language, policies, and leg-
> islative history of the Act for the Corps to exercise ju-
> risdiction over wetlands adjacent to but not regularly
> flooded by rivers, streams, and other hydrographic
> features more conventionally identifiable as 'waters.'"
> 474 U. S., at 131.

Applying this standard, we held that the Corps' decision
to interpret "waters of the United States" as encompassing
such wetlands was permissible. We recognized the practi-
cal difficulties in drawing clean lines between land and
water, *id.,* at 132, and deferred to the Corps' judgment
that treating adjacent wetlands as "waters" would advance
the "congressional concern for protection of water quality
and aquatic ecosystems," *id.,* at 133.

––––––––––

bodies of open water, see 33 CFR §323.2(a)(2) and (3) (1985)." 474 U. S.,
at 131–132, n. 8; see also *id.,* at 124, n. 2 (making the same reserva-
tion). Contrary to JUSTICE KENNEDY's reading, *ante,* at 23–24 (opinion
concurring in judgment), we were not reserving the issue of the Corps'
jurisdiction over wetlands adjacent to tributaries, but only reserving
the issue of the Corps' jurisdiction over truly isolated waters. A glance
at the cited regulation makes this clear. Section 323.2(a)(2) refers to
"[a]ll interstate waters including interstate wetlands" and §323.2(a)(3)
covers "[a]ll other waters such as intrastate lakes, rivers, streams
(including intermittent streams), mudflats, sandflats, wetlands,
sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds,
the use, degradation or destruction of which could affect interstate or
foreign commerce including any such waters." See also *Solid Waste
Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159,
163–164 (2001) (considering the validity of an application of §328.3(a)(3)
(1999), which is substantively identical to §323.2(a)(3) (1985) and to
§323.2(a)(5) (1978)). Wetlands adjacent to tributaries of traditionally
navigable waters were covered in the 1985 regulation by other provi-
sions of the regulation, namely a combination of §§323.2(a)(1) (covering
traditionally navigable waters), (4) (covering tributaries of subsection
(a)(1) waters), and (7) (covering wetlands adjacent to subsection (a)(4)
waters).

Contrary to the plurality's revisionist reading today, *ante*, at 21–24, 28–29, *Riverside Bayview* nowhere implied that our approval of "adjacent" wetlands was contingent upon an understanding that "adjacent" means having a "continuous surface connection" between the wetland and its neighboring creek, *ante,* at 23. Instead, we acknowledged that the Corps defined "adjacent" as including wetlands "'that form the border of or are in reasonable proximity to other waters'" and found that the Corps reasonably concluded that adjacent wetlands are part of the waters of the United States. 474 U. S., at 134 (quoting 42 Fed. Reg. 37128 (1977)). Indeed, we explicitly acknowledged that the Corps' jurisdictional determination was reasonable even though

> "not every adjacent wetland is of great importance to the environment of adjoining bodies of water. . . . If it is reasonable for the Corps to conclude that in the majority of cases, adjacent wetlands have significant effects on water quality and the ecosystem, its definition can stand. That the definition may include some wetlands that are not significantly intertwined with the ecosystem of adjacent waterways is of little moment, for where it appears that a wetland covered by the Corps' definition is in fact lacking in importance to the aquatic environment . . . the Corps may always allow development of the wetland for other uses simply by issuing a permit." 474 U. S., at 135, n. 9.

In closing, we emphasized that the scope of the Corps' asserted jurisdiction over wetlands had been specifically brought to Congress' attention in 1977, that Congress had rejected an amendment that would have narrowed that jurisdiction, and that even proponents of the amendment would not have removed wetlands altogether from the definition of "waters of the United States." *Id.,* at 135–139.

Disregarding the importance of *Riverside Bayview*, the plurality relies heavily on the Court's subsequent opinion in *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159 (2001) *(SWANCC).* In stark contrast to *Riverside Bayview*, however, *SWANCC* had nothing to say about wetlands, let alone about wetlands adjacent to traditionally navigable waters or their tributaries. Instead, *SWANCC* dealt with a question specifically reserved by *Riverside Bayview,* see n. 3, *supra*, namely, the Corps' jurisdiction over isolated waters— "'waters that are *not* part of a tributary system to interstate waters or to navigable waters of the United States, the degradation or destruction of which could affect interstate commerce.'" 531 U. S., at 168–169 (quoting 33 CFR §323.2(a)(5) (1978); emphasis added); see also 531 U. S., at 163 (citing 33 CFR §328.2(a)(3) (1999), which is the later regulatory equivalent to §323.2(a)(5) (1978)). At issue in *SWANCC* was "an abandoned sand and gravel pit . . . which provide[d] habitat for migratory birds" and contained a few pools of "nonnavigable, isolated, intrastate waters." 531 U. S., at 162, 166. The Corps had asserted jurisdiction over the gravel pit under its 1986 Migratory Bird Rule, which treated isolated waters as within its jurisdiction if migratory birds depended upon these waters. The Court rejected this jurisdictional basis since these isolated pools, unlike the wetlands at issue in *Riverside Bayview*, had no "significant nexus" to traditionally navigable waters. 531 U. S., at 167. In the process, the Court distinguished *Riverside Bayview*'s reliance on Congress' decision to leave the Corps' regulations alone when it amended the Act in 1977, since "'[i]n both Chambers, debate on the proposals to narrow the definition of navigable waters centered largely on the issue of wetlands preservation'" rather than on the Corps' jurisdiction over

truly isolated waters.  531 U. S., at 170 (quoting 474 U. S., at 136).[4]

Unlike *SWANCC* and like *Riverside Bayview,* the cases before us today concern wetlands that are adjacent to "navigable bodies of water [or] their tributaries," 474 U. S., at 123.  Specifically, these wetlands abut tributaries of traditionally navigable waters.  As we recognized in *Riverside Bayview*, the Corps has concluded that such wetlands play important roles in maintaining the quality of their adjacent waters, see *id.,* at 134–135, and consequently in the waters downstream.  Among other things, wetlands can offer "nesting, spawning, rearing and resting sites for aquatic or land species"; "serve as valuable stor-

───────────

[4] As THE CHIEF JUSTICE observes, the Corps and the EPA initially considered revising their regulations in response to *SWANCC. Ante,* at 1–2 (concurring opinion).  THE CHIEF JUSTICE neglects to mention, however, that almost all of the 43 States to submit comments opposed any significant narrowing of the Corps' jurisdiction—as did roughly 99% of the 133,000 other comment submitters.  See U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Government Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO–04–297, pp. 14–15 (Feb. 2004), http://www.gao.gov/new.items/d04297.pdf (hereinafter GAO Report) (all Internet materials as visited June 14, 2006, and available in Clerk of Court's case file); Brief for Association of State and Interstate Water Pollution Control Administrators as *Amicus Curiae.*  In any event, the agencies' decision to abandon their rulemaking is hardly responsible for the cases at hand.  The proposed rulemaking focused on isolated waters, which are covered by 33 CFR §328.3(a)(3) (1999) and which were called into question by *SWANCC*, rather than on wetlands adjacent to tributaries of navigable waters, which are covered by a combination of §§328.3(a)(1), (5), and (7) and which (until now) seemed obviously within the agencies' jurisdiction in light of *Riverside Bayview.*  See 68 Fed. Reg. 1994 (2003) ("The agencies seek comment on the use of the factors in 33 CFR 328.3(a)(3)(i)–(iii) . . . in determining [Clean Water Act] jurisdiction over isolated, intrastate, non-navigable waters").

age areas for storm and flood waters"; and provide "significant water purification functions." 33 CFR §320.4(b)(2) (2005); 474 U. S., at 134–135. These values are hardly "*independent*" ecological considerations as the plurality would have it, *ante,* at 23—instead, they are integral to the "chemical, physical, and biological integrity of the Nation's waters," 33 U. S. C. §1251(a). Given that wetlands serve these important water quality roles and given the ambiguity inherent in the phrase "waters of the United States," the Corps has reasonably interpreted its jurisdiction to cover non-isolated wetlands. See 474 U. S., at 131–135.[5]

This conclusion is further confirmed by Congress' deliberate acquiescence in the Corps' regulations in 1977. *Id.,* at 136. Both Chambers conducted extensive debates about the Corps' regulatory jurisdiction over wetlands, rejected efforts to limit this jurisdiction, and appropriated

———————

[5] Unsurprisingly, most Courts of Appeals to consider the scope of the Corps' jurisdiction after *SWANCC* have unhesitatingly concluded that this jurisdiction covers intermittent tributaries and wetlands adjacent—in the normal sense of the word—to traditionally navigable waters and their tributaries. *E.g., United States* v. *Deaton*, 332 F. 3d 698 (CA4 2003) (upholding the Corps' jurisdiction over wetlands adjacent to a ditch that might not contain consistently flowing water but did drain into another ditch that drained into a creek that drained into a navigable waterway); *Headwaters, Inc.* v. *Talent Irrigation Dist.,* 243 F. 3d 526 (CA9 2001) (treating as "waters of the United States" canals that held water intermittently and connected to other tributaries of navigable waters); *United States* v. *Rueth Development Co.,* 335 F. 3d 598, 604 (CA7 2003) (observing "it is clear that *SWANCC* did not affect the law regarding . . . adjacency" in upholding the Corps' jurisdiction over a wetland without finding that this wetland had a continuous surface connection to its adjacent tributary); *Baccarat Fremont* v. *U. S. Army Corps of Engineers,* 425 F. 3d 1150, 1156 (CA9 2005) (upholding the Corps' jurisdiction over wetlands separated by berms from traditionally navigable channels and observing that "*SWANCC* simply did not address the issue of jurisdiction over adjacent wetlands"); but see *In re Needham*, 354 F. 3d 340 (CA5 2003) (reading "waters of the United States" narrowly as used in the Oil Pollution Act of 1990).

funds for a "'National Wetlands Inventory'" to help the States "'in the development and operation of programs under this Act.'" *Id.,* at 135–139 (quoting 33 U. S. C. §1288(i)(2)). We found these facts significant in *Riverside Bayview*, see 474 U. S., at 135–139, as we acknowledged in *SWANCC*. See 531 U. S., at 170–171 (noting that "*[b]eyond Congress' desire to regulate wetlands adjacent to 'navigable waters,'* respondents point us to no persuasive evidence" of congressional acquiescence (emphasis added)).

The Corps' exercise of jurisdiction is reasonable even though not every wetland adjacent to a traditionally navigable water or its tributary will perform all (or perhaps any) of the water quality functions generally associated with wetlands. *Riverside Bayview* made clear that jurisdiction does not depend on a wetland-by-wetland inquiry. 474 U. S., at 135, n. 9. Instead, it is enough that wetlands adjacent to tributaries generally have a significant nexus to the watershed's water quality. If a particular wetland is "not significantly intertwined with the ecosystem of adjacent waterways," then the Corps may allow its development "simply by issuing a permit." *Ibid.*[6] Accordingly, for purposes of the Corps' jurisdiction it is of no significance that the wetlands in No. 04–1034 serve flood control and sediment sink functions, but may not do much to trap other pollutants, *supra,* at 4–5, and n. 2, or that the wetland in No. 04–1328 keeps excess water from Lake St. Clair but may not trap sediment, see *supra,* at 5–6.

Seemingly alarmed by the costs involved, the plurality shies away from *Riverside Bayview*'s recognition that jurisdiction is not a case-by-case affair. I do not agree with the plurality's assumption that the costs of preserving wetlands are unduly high. It is true that the cost of

---

[6] Indeed, "[t]he Corps approves virtually all section 404 permit[s]," though often requiring applicants to avoid or mitigate impacts to wetlands and other waters. GAO Report 8.

§404 permits are high for those who must obtain them[7]—but these costs amount to only a small fraction of 1% of the $760 billion spent each year on private and public construction and development activity. Sunding & Zilberman 80. More significant than the plurality's exaggerated concern about costs, however, is the fact that its omission of any discussion of the benefits that the regulations at issue have produced sheds a revelatory light on the quality (and indeed the impartiality) of its cost-benefit analysis.[8] The importance of wetlands for water quality is hard to overstate. See, *e.g.,* U. S. Congress, Office

_____

[7] According to the Sunding and Zilberman article cited by the plurality, *ante,* at 2, for 80% of permits the mean cost is about $29,000 (with a median cost of about $12,000). The Economics of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 63, 74 (2002) (hereinafter Sunding & Zilberman). Only for less than 20% of the permits—those for projects with the most significant impacts on wetlands—is the mean cost around $272,000 (and the median cost is $155,000). *Ibid.*

Of course, not every placement of fill or dredged material into the waters of the United States requires a §404 permit. Only when such fill comes from point sources—"discernible, confined and discrete conveyance[s]"—is a §404 permit needed. 33 U. S. C. §§1362(12), (14). Moreover, permits are not required for discharges from point sources engaged in, among other things, normal farming activities; maintenance of transportation structures; and construction of irrigation ditches, farm roads, forest roads, and temporary mining roads. §1344(f).

[8] Rather than defending its own antagonism to environmentalism, the plurality counters by claiming that my dissent is "policy-laden." *Ante,* at 28. The policy considerations that have influenced my thinking are Congress' rather than my own. In considering whether the Corps' interpretation of its jurisdiction is reasonable, I am admittedly taking into account the congressional purpose of protecting the physical, chemical, and biological integrity of our waters. See 33 U. S. C. §1251(a); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 863, 837 (1984) (considering whether the agency regulation was consistent with "the policy concerns that motivated the [Clean Air Act's] enactment").

of Technology Assessment, Wetlands: Their Use and Regulation, OTA–206, pp. 43–61 (Mar. 1984), http://govinfo.library.unt.edu/ota/Ota_4/DATA/1984/8433.PDF (hereinafter OTA) (describing wetlands' role in floodpeak reduction, shoreline protection, ground water recharge, trapping of suspended sediment, filtering of toxic pollutants, and protection of fish and wildlife). See also *ante*, at 20 (KENNEDY, J., concurring in judgment). Unsurprisingly, the Corps' approach has the overwhelming endorsement of numerous *amici curiae*, including 33 States and the county in which the property in No. 04–1384 is located.

In final analysis, however, concerns about the appropriateness of the Corps' 30-year implementation of the Clean Water Act should be addressed to Congress or the Corps rather than to the Judiciary. Whether the benefits of particular conservation measures outweigh their costs is a classic question of public policy that should not be answered by appointed judges. The fact that large investments are required to finance large developments merely means that those who are most adversely affected by the Corps' permitting decisions are persons who have the ability to communicate effectively with their representatives. Unless and until they succeed in convincing Congress (or the Corps) that clean water is less important today than it was in the 1970's, we continue to owe deference to regulations satisfying the "evident breadth of congressional concern for protection of water quality and aquatic ecosystems" that all of the Justices on the Court in 1985 recognized in *Riverside Bayview,* 474 U. S., at 133.

## III

Even setting aside the plurality's dramatic departure from our reasoning and holding in *Riverside Bayview*, its creative opinion is utterly unpersuasive. The plurality imposes two novel conditions on the exercise of the Corps'

jurisdiction that can only muddy the jurisdictional waters. As JUSTICE KENNEDY observes, "these limitations . . . are without support in the language and purposes of the Act or in our cases interpreting it." *Ante,* at 11 (opinion concurring in judgment). The impropriety of crafting these new conditions is highlighted by the fact that *no* party or *amicus* has suggested either of them.[9]

First, ignoring the importance of preserving jurisdiction over water beds that are periodically dry, the plurality imposes a requirement that only tributaries with the "relatively permanent" presence of water fall within the Corps' jurisdiction. *Ante,* at 13–14. Under the plurality's view, then, the Corps can regulate polluters who dump dredge into a stream that flows year round but may not be able to regulate polluters who dump into a neighboring stream that flows for only 290 days of the year—even if the dredge in this second stream would have the same effect on downstream waters as the dredge in the year-round one. *Ante,* at 14, n. 5.[10]

To find this arbitrary distinction compelled by the statute, the plurality cites a dictionary for a proposition that it does not contain. The dictionary treats "streams" as "wa-

---

[9] Only 3 of the 21 *amici* briefs filed on petitioners' behalf come even close to asking for one of the plurality's two conditions. These briefs half-argue that intermittent streams should fall outside the Corps' jurisdiction—though not for the reasons given by the plurality. See Brief for National Stone, Sand and Gravel Assn. et al. 20, n. 7; Brief for Foundation for Environmental and Economic Progress et al. 22–23; Brief for Western Coalition of Arid States 10.

[10] The plurality does suggest that "*seasonal* rivers" are not "necessarily exclude[d]" from the Corps' jurisdiction—and then further suggests that "streams" are "rivers." *Ante,* at 14, n. 5. I will not explore the semantic issues posed by the latter point. On the former point, I have difficulty understanding how a "seasonal" river could meet the plurality's test of having water present "relatively permanent[ly]." By failing to explain itself, the plurality leaves litigants without guidance as to where the line it draws between "relatively permanent" and "intermittent" lies.

ters" but has nothing to say about whether streams must contain water year round to qualify as "streams." *Ante,* at 13–14, and n. 6 (citing Webster's New International Dictionary 2493 (2d ed. 1954) (hereinafter Webster's Second), as defining stream as a "'current or course of water or other fluid, flowing on the earth'"). From this, the plurality somehow deduces that streams can never be intermittent or ephemeral (*i.e.,* flowing for only part of the year). *Ante,* at 13–15, and nn. 5–6. But common sense and common usage demonstrate that intermittent streams, like perennial streams, are still streams.[11] See, *e.g.,* U. S. Dept. of Interior, U. S. Geological Survey, Topographic Map Symbols 3 (2005), http://erg.usgs.gov/isb/pubs/booklets/symbols/ (identifying symbols for "[p]erennial stream" and "[i]ntermittent stream," as well as for "[p]erennial river" and "[i]ntermittent river"). This was true well before the passage of the Act in 1972. *E.g.,* Webster's Third New International Dictionary 1180 (1961) (hereinafter Webster's Third) (linking "intermittent" with "stream"). Indeed, we ourselves have used the term "intermittent stream" as far back as 1932. *Harrisonville* v. *W. S. Dickey Clay Mfg. Co.,* 289 U. S. 334, 335 (1933). Needless to say, Justice Brandeis' use of the term in a unanimous opinion should not be dismissed as merely a "useful oxymor[on]," *ante,* at 15, n. 6 (plurality opinion).

The plurality attempts to bolster its arbitrary jurisdictional line by citing two tangential statutory provisions

_____

[11] Indeed, in the 1977 debate over whether to restrict the scope of the Corps' regulatory power, Senator Bentsen recognized that the Corps' jurisdiction "cover[s] all waters of the United States, including small streams, ponds, isolated marshes, and intermittently flowing gullies." 4 Legislative History of the Clean Water Act of 1977 (Committee Print compiled for the Senate Committee on Environment and Public Works by the Library of Congress), Ser. No. 95–14, p. 903 (1978). His proposed amendment to restrict this jurisdiction failed. *Id.,* at 947.

and two inapplicable canons of construction. None comes close to showing that Congress directly spoke to whether "waters" requires the relatively permanent presence of water.

The first provision relied on by the plurality—the definition of "point source" in 33 U. S. C. §1362(14)—has no conceivable bearing on whether permanent tributaries should be treated differently from intermittent ones, since "pipe[s], ditch[es], channel[s], tunnel[s], conduit[s], [and] well[s]" can all hold water permanently as well as intermittently.[12] The second provision is §1251(b), which announces a congressional policy to "recognize, preserve, and protect the primary responsibilities and rights of States" to prevent pollution, to plan development, and to consult with the EPA. Under statutory additions made in 1977 when Congress considered and declined to alter the Corps'

—————————

[12] The plurality's reasoning to the contrary is mystifying. The plurality emphasizes that a ditch around a castle is also called a "moat" and that a navigable manmade channel is called a "canal." See *ante*, at 17, n. 7. On their face (and even after much head-scratching), these points have nothing to do with whether we use the word "stream" rather than "ditch" where permanently present water is concerned. Indeed, under the plurality's reasoning, we would call a "canal" a "stream" or a "river" rather than a "canal."

Moreover, we do use words like "ditch" without regard to whether water is present relatively permanently. In *Jennison* v. *Kirk,* 98 U. S. 453 (1879), for example, Justice Field used the term "ditch"—not "stream"—in describing a manmade structure that carried water year round. See also, *e.g., Knoxville Water Co.* v. *Knoxville,* 200 U. S. 22, 27 (1906) (opinion for the Court by Harlan, J.) (describing "pipes" that would continuously carry water); *ante,* at 20, 24 (plurality opinion) (using "channel" with reference to both intermittent and relatively permanent waters); *PUD No. 1 of Jefferson Cty.* v. *Washington Dept. of Ecology,* 511 U. S. 700, 709 (1994) (describing a "tunnel" that would carry water year round); *New Orleans Water-Works Co.* v. *Rivers,* 115 U. S. 674, 683 (1885) (opinion for the Court by Harlan, J.) (describing "conduits" that would supply water for a hotel). The plurality's attempt to achieve its desired outcome by redefining terms does no credit to lexicography—let alone to justice.

interpretation of its broad regulatory jurisdiction, the States may run their own §404 programs.  §§1344(g)–(h). As modified, §1251(b) specifically recognizes this role for the States as part of their primary responsibility for preventing water pollution.  Even focusing only on the Act as it stood between 1972 and 1977, but see *International Paper Co.* v. *Ouellette,* 479 U. S. 481, 489–490 (1987) (interpreting §1251(b) in light of the 1977 additions), broad exercise of jurisdiction by the Corps still left the States with ample rights and responsibilities.  See *S. D. Warren Co.* v. *Maine Bd. of Environmental Protection*, 547 U. S. __, __ (2006) (slip op., at 14–15).  States had the power to impose tougher water pollution standards than required by the Act, §1370, and to prevent the Corps and the EPA from issuing permits, §1341(a)(1)—not to mention nearly exclusive responsibility for containing pollution from nonpoint sources.

   The two canons of construction relied on by the plurality similarly fail to overcome the deference owed to the Corps. First, the plurality claims that concerns about intruding on state power to regulate land use compel the conclusion that the phrase "waters of the United States" does not cover intermittent streams.  As we have recognized, however, Congress found it "'essential that discharge of pollutants be controlled at the source,'" *Riverside Bayview,* 474 U. S., at 133 (quoting S. Rep. No. 92–414, p. 77 (1972)), and the Corps can define "waters" broadly to accomplish this aim.  Second, the plurality suggests that the canon of constitutional avoidance applies because the Corps' approach might exceed the limits of our Commerce Clause authority.  Setting aside whether such a concern was proper in *SWANCC*, 531 U. S., at 173; but see *id.,* at 192–196 (STEVENS, J., dissenting), it is plainly not warranted here.  The wetlands in these cases are not "isolated" but instead are adjacent to tributaries of traditionally navigable waters and play important roles in the

watershed, such as keeping water out of the tributaries or absorbing water from the tributaries. "There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as a key to flood control on navigable streams and their tributaries." *Oklahoma ex rel. Phillips* v. *Guy F. Atkinson Co.,* 313 U. S. 508, 525 (1941).

Most importantly, the plurality disregards the fundamental significance of the Clean Water Act. As then-Justice Rehnquist explained when writing for the Court in 1981, the Act was "not merely another law" but rather was "viewed by Congress as a 'total restructuring' and 'complete rewriting' of the existing water pollution legislation." *Milwaukee* v. *Illinois,* 451 U. S. 304, 317. "Congress' intent in enacting the [Act] was clearly to establish an all-encompassing program of water pollution regulation," and "the most casual perusal of the legislative history demonstrates that . . . views on the comprehensive nature of the legislation were practically universal." *Id.,* at 318, and n. 12; see also 531 U. S., at 177–181 (STEVENS, J., dissenting). The Corps has concluded that it must regulate pollutants at the time they enter ditches or streams with ordinary high-water marks—whether perennial, intermittent, or ephemeral—in order to properly control water pollution. 65 Fed. Reg. 12823 (2000). Because there is ambiguity in the phrase "waters of the United States" and because interpreting it broadly to cover such ditches and streams advances the purpose of the Act, the Corps' approach should command our deference. Intermittent streams can carry pollutants just as perennial streams can, and their regulation may prove as important for flood control purposes. The inclusion of all identifiable tributaries that ultimately drain into large bodies of water within the mantle of federal protection is surely wise.

The plurality's second statutory invention is as arbitrary as its first. Trivializing the significance of changing conditions in wetlands environments, the plurality im-

poses a separate requirement that "the wetland has a continuous surface connection" with its abutting waterway such that it is "difficult to determine where the 'water' ends and the 'wetland' begins." *Ante,* at 24. An "intermittent, physically remote hydrologic connection" between the wetland and other waters is not enough. *Ibid.* Under this view, wetlands that border traditionally navigable waters or their tributaries and perform the essential function of soaking up overflow waters during hurricane season— thus reducing flooding downstream—can be filled in by developers with impunity, as long as the wetlands lack a surface connection with the adjacent waterway the rest of the year.

The plurality begins reasonably enough by recognizing that the Corps may appropriately regulate all wetlands "'adjacent to'" other waters. *Ante,* at 21. This recognition is wise, since the statutory text clearly accepts this standard. Title 33 U. S. C. §1344(g)(1), added in 1977, includes "adjacent wetlands" in its description of "waters" and thus "expressly stated that the term 'waters' included adjacent wetlands." *Riverside Bayview,* 474 U. S., at 138. While this may not "conclusively determine the construction to be placed on the use of the term 'waters' elsewhere in the Act . . . , in light of the fact that the various provisions of the Act should be read *in pari materia*, it does at least suggest strongly that the term 'waters' as used in the Act does not necessarily exclude 'wetlands.'" *Id.,* at 138, n. 11.

The plurality goes on, however, to define "'adjacent to'" as meaning "with a continuous surface connection to" other water. *Ante,* at 21–24. It is unclear how the plurality reached this conclusion, though it plainly neglected to consult a dictionary. Even its preferred Webster's Second defines the term as "[l]ying near, close, *or* contiguous; neighboring; bordering on" and acknowledges that "[o]bjects are ADJACENT when they lie close to each other,

but *not necessarily in actual contact.*" Webster's Second 32 (emphasis added); see also Webster's Third 26. In any event, the proper question is not how the plurality would define "adjacent," but whether the Corps' definition is reasonable.

The Corps defines "adjacent" as "bordering, contiguous, or neighboring," and specifies that "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'" 33 CFR §328.3(c) (2005). This definition is plainly reasonable, both on its face and in terms of the purposes of the Act. While wetlands that are physically separated from other waters may perform less valuable functions, this is a matter for the Corps to evaluate in its permitting decisions. We made this clear in *Riverside Bayview*, 474 U. S., at 135, n. 9—which did not impose the plurality's new requirement despite an absence of evidence that the wetland at issue had the sort of continuous surface connection required by the plurality today. See *supra*, at 7; see also *ante*, at 15–17 (KENNEDY, J., concurring in judgment) (observing that the plurality's requirement is inconsistent with *Riverside Bayview*). And as the facts of No. 04–1384 demonstrate, wetland separated by a berm from adjacent tributaries may still prove important to downstream water quality. Moreover, Congress was on notice of the Corps' definition of "adjacent" when it amended the Act in 1977 and added 33 U. S. C. §1344(g)(1). See 42 Fed. Reg. 37129 (1977).

Finally, implicitly recognizing that its approach endangers the quality of waters which Congress sought to protect, the plurality suggests that the EPA can regulate pollutants before they actually enter the "waters of the United States." *Ante,* at 24–27. I express no view on the merits of the plurality's reasoning, which relies heavily on a respect for lower court judgments that is conspicuously lacking earlier in its opinion, *ante,* at 8–10.

I do fail to understand, however, why the plurality would not similarly apply this logic to dredged and fill material. The EPA's authority over pollutants (other than dredged and fill materials) stems from the identical statutory language that gives rise to the Corps' §404 jurisdiction. The plurality claims that there is a practical difference, asserting that dredged and fill material "does not normally wash downstream." *Ante,* at 26. While more of this material will probably stay put than is true of soluble pollutants, the very existence of words like "alluvium" and "silt" in our language, see Webster's Third 59, 2119, suggests that at least some fill makes its way downstream. See also, *e.g., United States* v. *Deaton,* 332 F. 3d 698, 707 (CA4 2003) ("Any pollutant or fill material that degrades water quality in a tributary has the potential to move downstream and degrade the quality of the navigable waters themselves"). Moreover, such fill can harm the biological integrity of downstream waters even if it largely stays put upstream. The Act's purpose of protecting fish, see 33 U. S. C. §1251(a)(2); *S. D. Warren Co.,* 547 U. S., at __ (slip op., at 13–14), could be seriously impaired by sediment in upstream waters where fish spawn, since excessive sediment can "smother bottom-dwelling invertebrates and impair fish spawning," OTA 48. See also, *e.g.,* Erman & Hawthorne, The Quantitative Importance of an Intermittent Stream in the Spawning of Rainbow Trout, 105 Transactions of the American Fisheries Society 675–681 (1976); Brief for American Rivers et al. as *Amici Curiae* 14 (observing that anadromous salmon often spawn in small, intermittent streams).

IV

While I generally agree with Parts I and II–A of JUSTICE KENNEDY's opinion, I do not share his view that we should replace regulatory standards that have been in place for over 30 years with a judicially crafted rule dis-

tilled from the term "significant nexus" as used in
*SWANCC*. To the extent that our passing use of this term
has become a statutory requirement, it is categorically
satisfied as to wetlands adjacent to navigable waters or
their tributaries. *Riverside Bayview* and *SWANCC* to-
gether make this clear. *SWANCC*'s only use of the term
comes in the sentence: "It was the significant nexus be-
tween the wetlands and 'navigable waters' that informed
our reading of the [Clean Water Act] in *Riverside Bay-
view*." 531 U. S., at 167. Because *Riverside Bayview* was
written to encompass "wetlands adjacent to navigable
waters and their tributaries," 474 U. S., at 123, and re-
served only the question of isolated waters, see *id.,* at 131–
132, n. 8; see also n. 3, *supra*, its determination of the
Corps' jurisdiction applies to the wetlands at issue in
these cases.

Even setting aside the apparent applicability of *River-
side Bayview*. I think it clear that wetlands adjacent to
tributaries of navigable waters generally have a "signifi-
cant nexus" with the traditionally navigable waters down-
stream. Unlike the "nonnavigable, isolated, intrastate
waters" in *SWANCC*, 531 U. S., at 171, these wetlands can
obviously have a cumulative effect on downstream water
flow by releasing waters at times of low flow or by keeping
waters back at times of high flow. This logical connection
alone gives the wetlands the "limited" connection to tradi-
tionally navigable waters that is all the statute requires,
see *id.,* at 172; 474 U. S., at 133—and disproves JUSTICE
KENNEDY's claim that my approach gives no meaning to
the word "'navigable,'" *ante,* at 21 (opinion concurring in
judgment). Similarly, these wetlands can preserve down-
stream water quality by trapping sediment, filtering toxic
pollutants, protecting fish-spawning grounds, and so forth.
While there may exist categories of wetlands adjacent to
tributaries of traditionally navigable waters that, taken
cumulatively, have no plausibly discernable relationship

to any aspect of downstream water quality, I am skeptical. And even given JUSTICE KENNEDY's "significant nexus" test, in the absence of compelling evidence that many such categories do exist I see no reason to conclude that the Corps' longstanding regulations are overbroad.

JUSTICE KENNEDY's "significant nexus" test will probably not do much to diminish the number of wetlands covered by the Act in the long run. JUSTICE KENNEDY himself recognizes that the records in both cases contain evidence that "should permit the establishment of a significant nexus," *ante,* at 27, see also *ante,* at 26, and it seems likely that evidence would support similar findings as to most (if not all) wetlands adjacent to tributaries of navigable waters. But JUSTICE KENNEDY's approach will have the effect of creating additional work for all concerned parties. Developers wishing to fill wetlands adjacent to ephemeral or intermittent tributaries of traditionally navigable waters will have no certain way of knowing whether they need to get §404 permits or not. And the Corps will have to make case-by-case (or category-by-category) jurisdictional determinations, which will inevitably increase the time and resources spent processing permit applications. These problems are precisely the ones that *Riverside Bayview*'s deferential approach avoided. See 474 U. S., at 135, n. 9 (noting that it "is of little moment" if the Corps' jurisdiction encompasses some wetlands "not significantly intertwined" with other waters of the United States). Unlike JUSTICE KENNEDY, I see no reason to change *Riverside Bayview*'s approach—and every reason to continue to defer to the Executive's sensible, bright-line rule.

## V

As I explained in *SWANCC*, Congress passed the Clean Water Act in response to wide-spread recognition—based on events like the 1969 burning of the Cuyahoga River in

STEVENS, J., dissenting

Cleveland—that our waters had become appallingly polluted. 531 U. S., at 174–175 (dissenting opinion). The Act has largely succeeded in restoring the quality of our Nation's waters. Where the Cuyahoga River was once coated with industrial waste, "[t]oday, that location is lined with restaurants and pleasure boat slips." EPA, A Benefits Assessment of the Water Pollution Control Programs Since 1972, p. 1–2 (Jan. 2000), http://www.epa.gov/ost/economics/assessment.pdf. By curtailing the Corps' jurisdiction of more than 30 years, the plurality needlessly jeopardizes the quality of our waters. In doing so, the plurality disregards the deference it owes the Executive, the congressional acquiescence in the Executive's position that we recognized in *Riverside Bayview*, and its own obligation to interpret laws rather than to make them. While JUSTICE KENNEDY's approach has far fewer faults, nonetheless it also fails to give proper deference to the agencies entrusted by Congress to implement the Clean Water Act.

I would affirm the judgments in both cases, and respectfully dissent from the decision of five Members of this Court to vacate and remand. I close, however, by noting an unusual feature of the Court's judgments in these cases. It has been our practice in a case coming to us from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate. That prior practice has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views.[13] In these cases, however, while both the plurality and JUSTICE KENNEDY agree that

---

[13] See, *e.g., Screws* v. *United States,* 325 U. S. 91, 131–134 (1945) (Rutledge, J., concurring in result); *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622, 674 (1994) (STEVENS, J., concurring in part and concurring in judgment); *Hamdi* v. *Rumsfeld,* 542 U. S. 507, 553–554 (2004) (SOUTER, J., concurring in part, dissenting in part, and concurring in judgment).

there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand. Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's or JUSTICE KENNEDY's test is satisfied—on remand each of the judgments should be reinstated if *either* of those tests is met.[14]

---

[14] I assume that JUSTICE KENNEDY's approach will be controlling in most cases because it treats more of the Nation's waters as within the Corps' jurisdiction, but in the unlikely event that the plurality's test is met but JUSTICE KENNEDY's is not, courts should also uphold the Corps' jurisdiction. In sum, in these and future cases the United States may elect to prove jurisdiction under either test.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 04–1034 and 04–1384

———————

JOHN A. RAPANOS, ET UX., ET AL., PETITIONERS
04–1034                    *v.*
UNITED STATES


JUNE CARABELL ET AL., PETITIONERS
04–1384                    *v.*
UNITED STATES ARMY CORPS OF ENGINEERS ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 19, 2006]

JUSTICE BREYER, dissenting.

In my view, the authority of the Army Corps of Engineers under the Clean Water Act extends to the limits of congressional power to regulate interstate commerce. See *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159, 181–182 (2001) (*SWANCC*) (STEVENS, J., dissenting). I therefore have no difficulty finding that the wetlands at issue in these cases are within the Corps' jurisdiction, and I join JUSTICE STEVENS' dissenting opinion.

My view of the statute rests in part upon the nature of the problem. The statute seeks to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U. S. C. §1251(a). Those waters are so various and so intricately interconnected that Congress might well have decided the only way to achieve this goal is to write a statute that defines "waters" broadly and to leave the enforcing agency with the task of restricting the scope of that definition, either wholesale through regulation or

retail through development permissions. That is why I believe that Congress, in using the term "waters of the United States," §1362(7), intended fully to exercise its relevant Commerce Clause powers.

I mention this because the Court, contrary to my view, has written a "nexus" requirement into the statute. *SWANCC, supra,* at 167; *ante,* at 22 (opinion of KENNEDY, J.) ("[T]he Corps' jurisdiction over wetlands depends upon the existence of a significant nexus between the wetlands in question and navigable waters in the traditional sense"). But it has left the administrative powers of the Army Corps of Engineers untouched. That agency may write regulations defining the term—something that it has not yet done. And the courts must give those regulations appropriate deference. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984).

If one thing is clear, it is that Congress intended the Army Corps of Engineers to make the complex technical judgments that lie at the heart of the present cases (subject to deferential judicial review). In the absence of updated regulations, courts will have to make ad hoc determinations that run the risk of transforming scientific questions into matters of law. That is not the system Congress intended. Hence I believe that today's opinions, taken together, call for the Army Corps of Engineers to write new regulations, and speedily so.